**CMM CABLE REP., INC. d/b/a Creative Media Management, Plaintiff,**

v.

**OCEAN COAST PROPERTIES, INC. d/b/a WPOR–FM, et al., Defendants.**

Civ. No. 94–290–P–H.

United States District Court, D. Maine.

June 1, 1995.

Anne S. Mason, Mason & Associates, Clearwater, FL, John H. Rich, III, William J. Sheils, Perkins Thompson Hinckley & Keddy, Portland, ME, for plaintiff.

James G. Goggin, Roy S. McCandless, Verrill & Dana, Portland, ME, for defendants.

**1.** The defendants Ocean Coast Properties, Inc. (doing business as WPOR), Robert Gold, Graphics North, Inc., and James Spizuoco have presented a unified defense and are jointly and severally liable for any judgment in favor of CMM unless they present evidence and argument indicating otherwise. The defendants William Therriault and Philip Corper have been dismissed by the plaintiff's stipulation.

**2.** The filings by the lawyers in this case have made the task of ruling on summary judgment much more difficult than it should be. Local Rule 19(b) requires each party to file a concise summary of facts with citations to the record. The plaintiff in particular has failed to provide citations to many of the facts that it must adduce to survive summary judgment. The defendants' statement of facts includes argument as well as

## AMENDED ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND MOTION TO EXCLUDE PLAINTIFF'S EXPERT

HORNBY, District Judge.

CMM Cable Rep., Inc. ("CMM") has sued Ocean Coast Properties, Inc. (radio station WPOR), several of WPOR's executives, and its graphic design consultant for federal copyright, trademark, and trade dress infringement and certain related state law claims. The defendants, whom I shall refer to collectively as "WPOR,"[1] have moved for summary judgment on all counts.[2] I now GRANT summary judgment to the defendants on Count II (trademark infringement), Count III (federal unfair competition—trademark infringement), and Counts IV, V, VI, and VII (the state law claims). As for Count I (copyright infringement), I GRANT summary judgment on all aspects of the claim except for infringement of CMM's "KIX Paycheck Payoff" brochure, as to which summary judgment is DENIED. The motion by WPOR to exclude CMM's expert witness, Creighton Hoffman, is GRANTED IN PART and DENIED IN PART. Since this action is bound to affect all the other pending disputes between the parties, the clerk shall endorse them as "no action necessary" and the lawyers shall notify the court no less than two (2) business days before trial what, if any, additional rulings are necessary.

### STATEMENT OF FACTS[3]

The facts before me on the summary judgment record, viewed most favorably to CMM,

some factual assertions without record citations. The parties are bound by their Rule 19 Statements of Fact, however, and my summary judgment decision will be based solely upon facts properly presented therein. *See Stepanischen v. Merchants Despatch Transp. Corp.,* 722 F.2d 922, 930–32 (1st Cir.1983).

**3.** Because the parties' Local Rule 19 statements do not provide the context, I have borrowed as well from the plaintiff's Complaint.

Citation Key:

C ¶ # : First Amended Complaint
DS ¶ # : Defendants' Statement of Undisputed Facts
PS ¶ # : Plaintiff's Statement of Disputed Facts
DSS ¶ # : Defendants' Supplemental Statement of Undisputed Facts

are as follows. CMM develops and markets promotional campaigns for radio stations to increase and preserve listenership. C ¶ 9. CMM markets its promotions to radio stations nationally, using promotional materials and informational brochures that bear copyright and trademark notifications. C ¶ 11. CMM's promotions are only effective if sold to a single radio station in a particular market area; such "market-exclusivity" has been CMM's practice. C ¶ 10. CMM's customers are radio stations, who spend approximately $30,000 to engage CMM's services to run a promotion of the type involved here. DS, PS ¶ 20.

Two of CMM's radio promotions are called "Payroll Payoff" and "Paycheck Payoff." CMM registered these names as servicemarks in 1991. C ¶¶ 36–37; DS ¶ 26. The promotions have been marketed to and purchased by numerous radio stations in the United States on a market-exclusive basis. C ¶ 13. Payroll Payoff and Paycheck Payoff radio promotions entice a listener to listen to the station and phone in if her name is selected and read on the air. If she is successful, she will go "on the payroll" at the station and earn an "hourly wage." Listeners enter their names for the contest by returning the reply card on promotional flyers. C ¶ 17. One name is read on the air each hour during certain pre-announced time periods. C ¶ 15. If the named listener does not call within the time limit, the previous successful caller stays "on the payroll" and continues to be paid until replaced by a named listener who does call in time. C ¶ 16. All contestants who successfully go "on the payroll" are eligible for a grand prize drawing at the end of the promotion period. DSS ¶ 4.

CMM owns registered copyrights for its promotional materials, informational brochures, and incorporated artwork and has continuously provided copyright notice on such materials. C ¶ 18. Radio contest promotions like these have certain standard, inherent characteristics, including (1) inviting a potential listener to enter the contest, (2) requiring the contestant to listen to the station to determine the right moment to participate, and (3) requiring the contestant to

telephone the station at that time. DS, PS ¶ 3. CMM's principal, Nancy Izor, "borrowed" the idea for these payroll promotions from an earlier radio promotion she heard called "Working Women's Wednesday," in which female listeners called in on Wednesday to be placed on the radio station's "payroll" to earn an "hourly wage." DS, PS ¶ 4. Under CMM's version, the promotion runs all week, includes men and women, and involves supporting "printed collateral" materials. PS ¶ 4.

In the spring of 1994, WPOR began considering an on-air promotional game to bolster its Fall 1994 Arbitron listenership ratings. DS ¶ 5. WPOR contacted CMM in the summer of 1994 to inquire about running one of CMM's payroll promotions. DS ¶ 6. At that time, WPOR had in its possession one of CMM's Paycheck Payoff brochures. DS ¶ 6. Following its practice of market-exclusivity, CMM declined to license a payroll promotion to WPOR because CMM was negotiating a contract to produce promotions for one of WPOR's competitors, WMGX. DS ¶ 6; C ¶ 21. (Use of a payroll promotion by a competitor such as WPOR would make it highly unlikely that WMGX would purchase such a promotion from CMM. C ¶ 21.) CMM informed WPOR of its copyrights and trademarks for its payroll promotions. C ¶ 21.

WPOR was then advised by its independent media consultant that payroll-type radio promotions were not original to nor conceived by CMM, and that CMM did not own a monopoly over such promotions. DS ¶ 6. WPOR decided to run a promotion called "Payday Contest," which was virtually identical to CMM's promotions in its rules and methods of operation. C ¶ 23. WPOR produced a direct mail brochure, newspaper, television, and facsimile advertisements, and on-the-air promotional materials. DS ¶ 7. The defendants James Spizuoco and his firm Graphics North, Inc. designed the Payday Contest brochure. DS ¶ 8. WPOR gave Spizuoco some suggested text copy as well as a CMM Paycheck Payoff brochure from a promotion CMM had produced for a station in Florida (the "KIX brochure"). DS ¶ 8. WPOR instructed Spizuoco "not to make it look like" the KIX brochure. DS ¶ 8. Spiz-

uoco looked at the KIX brochure, but he claims that he then put it away and produced the WPOR brochure from his own ideas. DS ¶ 9. Differences between the two brochures include such things as typestyle, colors, certain layout elements, and the substitution of a time clock (WPOR version) for the cowboy boot and lariat motif (CMM/KIX version). DS, PS ¶ 10. CMM's KIX brochure and the WPOR brochure nevertheless have many striking similarities. PS ¶ 10. Their size (8½″ × 14″) and folds are almost identical; their layout is the same in the sense that it is horizontal for all but the mailer, which is vertical and appears in a 3″ serrated form to the far right; and the participation steps—1. "FILL OUT," 2. "TUNE IN," and 3. "CALL IN"—are an important textual element. On the first page of both brochures the radio station is identified at the top, the name of the contest comes in the middle, the number of dollars available for prizes comes about three-quarters of the way down, and the last line on the page of each is "JUST FOR LISTENING." In both instances, when the brochure is opened, the top left-hand corner begins "Listen to . . ." and then the radio station is identified. At the top right of the open KIX brochure the copy reads "the best in hot new country." Across the top of the WPOR brochure appears "the best in today's hot country and your all time favorites!" At the left side of the open brochure the KIX version states: "Call in, clock in and make $50 an hour!" The WPOR brochure in almost the same position states "Call in . . . punch in and you can earn $25 an hour!" Each brochure has an arrow next to that copy with the words inside the arrow: "Here's how." In step 3 of the contest participation process, the KIX brochure states: "Call in, clock in & win!" In step 3, the WPOR brochure states: "Call in, punch in & win!" Under this heading the KIX brochure goes on to state: "When you hear your name, call: (phone number) within 10 minutes and 'clock in'!" The WPOR brochure analogue is: "When you hear your name announced on the air, call in and go 'on the clock.'" At the lower right in both brochures appears the station identification. In the lower middle in both brochures appears the copy "complete contest rules available at (radio station)." In the return mail portion, the KIX brochure contains a check filling up the lower half of the return mailer; the WPOR brochure replaces the check with a bogus $25 bill located in almost the identical position. (The location of the return address and postal permit are standard and insignificant.)

WPOR's Payday Contest ran from late September through December 14, 1994, during a period known in the radio industry as the fall "sweeps period," when the rating firm Arbitron measures the listenership share of each station in the Portland market. DS, PS ¶ 11. CMM received two phone calls from WPOR's competitors inquiring whether the WPOR Payday Contest was produced by CMM. DS, PS ¶ 24. Despite running the Payday Contest, WPOR's listenership in the fall 1994 sweeps period declined from its previous levels. DS ¶ 12.

## PROCEDURAL HISTORY

CMM filed its complaint on October 3, 1994, seeking damages and injunctive relief against the WPOR defendants, claiming infringement of CMM's copyrights, trademarks, and trade dress in violation of federal law, and making similar state law claims. After three days of hearings, I granted a preliminary injunction against WPOR's use of its Payday Contest brochure, but I did not enjoin WPOR from continued use of the Payday Contest itself, its title, the "employment metaphor," the broadcast copy, and the other collateral and advertising materials. *CMM Cable Rep., Inc. v. Ocean Coast Properties, Inc.,* 879 F.Supp. 132 (D.Me.1994). CMM appealed that interlocutory order, but the First Circuit held that the appeal had been rendered moot when WPOR completed airing of the contest. *CMM Cable Rep., Inc. v. Ocean Coast Properties, Inc.,* 48 F.3d 618 (1st Cir. Mar. 6, 1995). The defendants moved for summary judgment on all CMM's claims on March 13, 1995.

## LAW

### Copyright Infringement

To establish copyright infringement, a plaintiff must prove "(1) ownership of

a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361, 111 S.Ct. 1282, 1296, 113 L.Ed.2d 358 (1991). To show ownership of a valid copyright, a plaintiff must prove that the work is original and that the plaintiff complied with applicable statutory formalities. *Lotus Dev. Corp. v. Borland Int'l*, 49 F.3d 807, 813 (1st Cir.1995). Copying may be proved either with direct evidence or circumstantially by showing that the alleged infringer had access to the copyrighted work and that the offending and copyrighted works are so similar that copying may be inferred. *Id.*

### The Brochure

■ CMM has met the statutory formalities to copyright the text, layout, and graphic design elements of its KIX Paycheck Payoff brochure. There is no dispute that the KIX brochure is an original work of CMM. WPOR's access to the KIX brochure is also undisputed: WPOR gave the brochure to its graphic designer to use in creating the WPOR brochure. Given the striking similarities in the two brochures, CMM easily meets its summary judgment burden of showing that there is a triable issue of copying. Indeed, summary judgment could also—but not quite—go in CMM's favor. Therefore, I **DENY** WPOR's motion for summary judgment as to copyright infringement of the KIX brochure.

### The Contest

■ CMM cannot copyright the ideas, concepts, or methodologies that constitute the promotional contest itself. 17 U.S.C. § 102(b); *Anti–Monopoly, Inc. v. General Mills Fun Group*, 611 F.2d 296, 300 n. 1 (9th Cir.1979), *reversed on other grounds*, 684 F.2d 1316 (9th Cir.1982), *and cert. denied*, 459 U.S. 1227, 103 S.Ct. 1234, 75 L.Ed.2d 468 (1983); *see also Affiliated Enter., Inc. v. Gruber*, 86 F.2d 958, 961 (1st Cir.1936) (dictum). Copyright protection is limited to the expression of those ideas and concepts in tangible form, such as brochures, print and television advertisements, and recorded on-air radio copy. To the extent that CMM's

complaint can be interpreted as claiming infringement of the promotion itself (i.e., a method of conducting a radio promotional contest), I **GRANT** summary judgment in favor of WPOR.

### The Employment Metaphor

It is axiomatic that copyright protects expressions, not ideas. *See* 1 N. Nimmer & D. Nimmer, *Copyright* § 2.03[D] (1994). CMM claims that the metaphor of employment it uses in its Payroll and Paycheck Payoff promotions is protectible expression, not an idea. In CMM's view, "employment" is a metaphorical way of expressing the successful contestant's situation as her cash prize grows hour by hour, Monday through Friday, nine a.m. to five p.m. From that perspective, the unprotectible "idea" is a contest with a jackpot that accumulates hourly; the protectible "expression" is the metaphorical language of hourly employment to capture the idea. WPOR, on the other hand, argues that an employment-related accumulating jackpot contest is itself only an idea, and that while specific language used to express that idea is protectible, the employment idea itself is not.

■ I conclude that the employment metaphor is protectible expression. Payroll employment is only one way in which the mechanics of an accumulating jackpot promotion might be described. First, no metaphor at all is actually needed. Second, if a metaphor is to be used, there are other possibilities: rent; interest; dividends; commissions; royalties; etc. Thus, I conclude that the use of employment-related terms and images in the various tangible works associated with CMM's promotions is protectible expression.

■ But although I find that the employment metaphor is copyrightable expression, I conclude that it was not an original contribution of CMM. "The *sine qua non* of copyright is originality. To qualify for copyright protection, a work must be original to the author. Original, as the term is used in copyright, means only that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity." *Feist*, 499 U.S. at 345, 111 S.Ct.

at 1287. Ms. Izor, the "creator" of CMM's payroll games, admits that the employment concept originated from an earlier radio promotion that she heard, called "Working Women's Wednesday." At the preliminary injunction hearing, Ms. Izor gave the following questions and answers on cross-examination:

Q. What was it that caused you to think of let's have a Payroll Payoff promotion?

A. Hearing Working Women's Wednesday on the air at KTK and *hearing the actual methodology of earning an hourly wage.*

Q. Those are the things that prompted you to come up with the Payroll Payoff contest?

A. It prompted me to take that particular mechanic and expand it into a total week campaign, create graphics to go with it, make it a full-time job instead of a part-time job, make it available to everyone instead of women and make it much more than a Wednesday type contest.

Transcript of October 18, 1994 Hearing, p. 127 lines 10–20 (emphasis supplied). CMM argues that Izor added a sufficient modicum of originality by using the promotion for both sexes, running it all week, and adding a grand prize. But these "original" contributions do not extend or vary the *employment metaphor*; they simply expand the operating scope of the promotion.[4] Therefore, I hold that, although it can protect the specific language and layouts it copyrights, CMM is unable to protect by copyright the employment metaphor itself in its payroll promotions.

### Advertising and Broadcast Copy

■ CMM claims that WPOR's Payday Contest print advertisements and on-air copy also infringe its copyright by using employment imagery and expressive terms such as "payday," "punch in," "go on the clock," and "begin earning $25 an hour." These claims fail for one or both of two reasons: (1) CMM cannot prevent WPOR from using employment metaphors or imagery because these were not original works of CMM, and (2) "[w]ords and short phrases such as names, titles, and slogans" may not be copyrighted. 37 CFR § 202.1(a).[5] *See Narell v. Freeman,* 872 F.2d 907, 911 (9th Cir.1989) (ordinary phrases and commonly-used expressions not subject to copyright protection); *Alberto-Culver Co. v. Andrea Dumon, Inc.,* 466 F.2d 705, 711 (7th Cir.1972) ("most personal sort of deodorant" is short phrase or expression, not an "appreciable amount of text," thus not protectible by copyright). I GRANT summary judgment for WPOR as to its Payroll Contest newspaper advertisements and on-air copy.

### Damages

A successful plaintiff in a copyright infringement action is entitled to recover "actual damages suffered ... as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages." 17 U.S.C. § 504(b). CMM will thus have the opportunity to present evidence to the jury concerning its damages and WPOR's profits from the brochure infringement. Alternatively, CMM may elect at any time before final judgment to recover statutory damages, which are assessed by the judge, rather than the jury, in accordance with 17 U.S.C. § 504(c). *See PGP Music v. Davric Maine Corp.,* 623 F.Supp. 472, 473 (D.Me.1985), *following Chappell & Co. v. Palermo Cafe Co.,* 249 F.2d 77 (1st Cir.1957).

■ I am not persuaded by WPOR's arguments that CMM is entirely unable to prove either that it suffered actual damages or that

---

**4.** They also seem trivial—extending Working Women's Wednesday to include men and to run for five days is of the same magnitude as the geographic selection and alphabetic arrangement of telephone numbers in *Feist.* They lack the minimal quantum of creativity required for copyright. *See Feist,* 499 U.S. at 363, 111 S.Ct. at 1296–97; 1 N. Nimmer & D. Nimmer, *Copyright* § 2.01[B] at 2–15 to 2–18 (1994). CMM has admitted that radio promotions generally run five days a week and are open to men and women. PS, DS ¶ 16.

**5.** "Although [this Copyright Office regulation] does not have the force of statute, it is a fair summary of the law." *Kitchens of Sara Lee, Inc. v. Nifty Foods Corp.,* 266 F.2d 541, 544 (2d Cir.1959).

WPOR profited from the infringement and that CMM should therefore lose its right to a jury trial. Although it will undoubtedly be difficult, CMM may be able to prove that the market value of its payroll promotions overall was reduced by WPOR's copying of its brochure, or prove a resulting general loss of goodwill or market reputation for CMM as a firm arising from the brochure infringement. Likewise, the fact that WPOR's Arbitron ratings went down during the Payroll Contest promotion does not as a matter of law prove that WPOR did not profit from the brochure copying; a jury may be persuaded that WPOR's ratings and revenues would have been even lower if there had been no copying from the brochure, or that WPOR's profits were enhanced by cost savings that may have resulted from copying instead of paying for the brochure.

■ The federal copyright statute eases the plaintiff's burden in recovering an infringer's profits:

> The copyright owner is entitled to recover the actual damages suffered by him or her as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages. In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work.

17 U.S.C. § 504(b). The copyright owner may only recover profits "attributable to the infringement," but once infringement has been proven, the plaintiff need only prove the defendant's gross revenue (sales). The burden then shifts to the infringer to prove that certain expenses are properly deductible from gross revenue or that some or all of that revenue is attributable to factors other than infringement of the copyrighted work. *See Data General v. Grumman Systems Support,* 36 F.3d 1147, 1173–77 (1st Cir. 1994). Nonetheless, "where it is clear ... that not all of the profits are attributable to the infringing material, the copyright owner is not entitled to recover all of those profits

merely because the infringer fails to establish with certainty the portion attributable to the non-infringing elements. [Where] the evidence suggests some division which may rationally be used as a springboard it is the duty of the court to make some apportionment." *Cream Records v. Jos. Schlitz Brewing Co.,* 754 F.2d 826, 828–29 (9th Cir.1985). Because it is obvious that not all of WPOR's revenues or profits are attributable to copying the brochure, I will expect to instruct the jury (if it finds liability) to apportion equitably any award of profits even if WPOR is unable to meet its burden to prove with certainty the extent to which its profits are due to non-infringing factors. Indeed, it appears that CMM may have extraordinary difficulty proving that it suffered actual damages from WPOR's copying of the KIX brochure or that WPOR obtained profits as a result. CMM may ultimately elect to seek statutory damages instead under 17 U.S.C. § 504(c), where it does not need to provide proof.

### CMM's Expert Witness

I find that CMM's expert witness, Creighton Hoffman, is competent to testify as to CMM's actual damages and lost profits, assuming that his testimony will be based on information provided by CMM's principals of a type that financial experts typically use in calculating profit and loss. Hoffman is not qualified to testify as to WPOR's profits from infringement, on the other hand, because he has no personal knowledge as to what portion, if any, of WPOR's profits are attributable to the infringement and he is not a qualified expert on that subject. If CMM relies instead on the statutory burden shifting of 17 U.S.C. § 504(b), then it is not apparent why Hoffman's testimony would be necessary or helpful to a jury, except perhaps on rebuttal. Thus, Hoffman's testimony shall initially be limited to CMM's actual damages and lost profits.

### TRADEMARK INFRINGEMENT

It is undisputed that CMM uses its registered trademarks "Payroll Payoff" and "Paycheck Payoff" in commerce. To prevail on its trademark infringement claim, CMM

must prove that WPOR's use of "Payday Contest" as a name for its promotion "is likely to cause confusion, or to cause mistake, or to deceive." *See* 15 U.S.C. § 1114(1).

■ The First Circuit has listed eight factors to consider in assessing the likelihood of confusion in a trademark infringement action: (1) similarity of the marks; (2) similarity of the goods; (3) relationship between the parties' channels of trade; (4) relationship between the parties' advertisements; (5) classes of prospective purchasers; (6) evidence of actual confusion; (7) the defendant's intent in adopting its mark; (8) strength of the plaintiff's mark. *Boston Athletic Ass'n v. Sullivan,* 867 F.2d 22, 29 (1st Cir.1989). Although likelihood of confusion and the eight factors used to assess such likelihood are factual inquiries, summary judgment is appropriate if, taking the facts before the court and all reasonable inferences therefrom most favorably to CMM, no reasonable jury could find in favor of CMM. *See Astra Pharmaceutical Prods., Inc. v. Beckman Instruments,* 718 F.2d 1201, 1204–09 (1st Cir.1983) (granting summary judgment for trademark infringement defendant); *Pignons S.A. de Mecanique v. Polaroid Corp.,* 657 F.2d 482, 487–92 (1st Cir.1981) (same).

■ The eight-factor confusion test is not applied to assess confusion in the abstract; it is focused on the likelihood that commercially relevant persons or entities will be confused. *See Astra Pharmaceutical,* 718 F.2d at 1207. Actual and potential customers of the trademark owner are the most obvious "relevant persons," but other persons might be relevant in a given case. "To be actionable ..., the confusion must threaten the commercial interests of the owner of the mark, but it is not limited to the confusion of persons doing business directly with the [trademark owner or infringer]." *Restatement (Third) of Unfair Competition* § 20 at 210 (1995). In this case, it is clear that radio stations are the customers of CMM; there-

fore, radio station marketing and promotion decisionmakers are the obvious class whose confusion is relevant. On this summary judgment record, CMM has presented few facts and even fewer arguments[6] to support its trademark and trade dress infringement claims, and what it has presented deals solely with the likelihood of confusion of radio station management and consultants. CMM has presented no facts or arguments that radio *listeners* are also relevant persons for the likelihood of confusion analysis and I therefore treat that argument as waived. I apply the eight factors with an eye to the potential for confusion solely among radio station marketing decisionmakers. Even viewing the facts favorably to CMM, I must infer that these decisionmakers are relatively sophisticated commercial purchasers who expend significant sums of money (it costs approximately $30,000 to license Payroll Payoff) after careful consideration. *See Astra Pharmaceutical,* 718 F.2d at 1206. Such purchasers are less likely to be confused as to the source or origin of a product than ordinary consumers of inexpensive goods or services.

Consideration of the first factor, similarity of the marks, leans against confusion. It is true that "payroll," "paycheck" and "payday" are all related to wages and all have the same first syllable. Each describes an entirely different concept, however, that can be separately defined. Anyone who has ever worked understands the differences between a payroll and a payday or a paycheck and a payday. "Payoff," moreover, has an entirely different connotation than "contest." When the two words are put together, such as "PAYROLL PAYOFF," the effect is very different from "PAYDAY contest." *Cf. Volkswagenwerk Aktiengesellschaft v. Wheeler,* 814 F.2d 812, 817 (1st Cir.1987). Although the marks both evoke an employment context, "[t]rademark protection is not intended to allow a person to procure a certain impression or association for his own exclusive use, and others must be permitted to

6. The only trademark claim argument that CMM makes in its brief is that likelihood of confusion is a factual inquiry that cannot be resolved on summary judgment. That argument flies in the face of the decisions in *Astra Pharmaceutical Prods., Inc. v. Beckman Instruments,* 718 F.2d 1201 (1st Cir.1983) and *Pignons S.A. de Mecanique v. Polaroid Corp.,* 657 F.2d 482 (1st Cir. 1981) (both upholding summary judgment for trademark defendant based on eight-factor confusion test).

communicate the same impression or association." *Taj Mahal Enterprises, Ltd. v. Trump,* 745 F.Supp. 240, 248 (D.N.J.1990).

The second factor, similarity of the goods, clearly favors a finding that confusion is likely; the "goods"—Payroll Payoff and Payday Contest—are virtually identical.

The next three factors, channels of trade, advertising, and classes of purchasers, are frequently considered together in the First Circuit. *See, e.g., Astra Pharmaceutical,* 718 F.2d 1201, 1206 (1st Cir.1983). Here, these factors suggest little likelihood of confusion. It is undisputed that WPOR only produces radio promotional materials for its own use; it does not advertise or sell such materials to other radio stations or to any other purchasers. Although neither party has briefed the point, it appears from the parties' statements of fact that CMM mails informational brochures and samples relating to its promotional contests to radio stations. It also appears that media consultants play an important role in the decisionmaking process when radio stations purchase promotional services. It is fair to infer that the use of consultants helps to minimize confusion as to the sources of competing promotions. The record does not reveal whether the direct mailings increase or reduce the likelihood of confusion. Given that WPOR offers no products to and has no presence in the trade channels and advertising that reach CMM's customers, and given the limited facts I have on CMM's marketing methods, these three factors do not point to a likelihood of confusion.

There is limited evidence of actual confusion, the sixth factor. The only relevant fact on the summary judgment record is that "CMM received only two phone calls from WPOR competitors inquiring whether CMM sponsored WPOR's contest." *See* PS at ¶ 24. CMM did not object to this statement and offered no additional facts on the point.[7]

Based on that statement, I cannot determine whether the callers were actually confused (i.e., thought that CMM was the source of the Payday Contest) or instead were inquiring whether CMM knew who the source was, knowing that CMM offered a similar product. *Cf. Pignons,* 657 F.2d at 490 (unclear whether letter from distributor showed confusion as to source or commercial concerns based on awareness of source).

WPOR's intent, factor seven, does not point clearly in either direction. WPOR wanted to run a payroll-type contest and, when it could not do so with CMM's help, resolved to find another way. Through McVay, it did find another source. But WPOR had no logical motive to have its promotion confused with CMM sponsorship or marks. WPOR's only audience was listeners who have no knowledge of CMM. This is not a "passing off" type of case.

■ Finally, the strength of the mark, factor eight, does not cut in either direction. To assess the strength of a mark, one considers its distinctiveness or renown, the length of time it has been used, whether similar marks are in use, and the plaintiff's actions in promoting its mark. *Boston Athletic Ass'n v. Sullivan,* 867 F.2d 22, 32 (1st Cir.1989). As to distinctiveness, these appear to be "suggestive" marks, neither the weakest ("generic" and "descriptive") nor the strongest ("fanciful" and "arbitrary") of marks. *See S.S. Kresge Co. v. United Factory Outlet, Inc.,* 598 F.2d 694, 696 (1st Cir.1979). The marks have been in use by CMM since 1991. One similar mark has been used for a radio promotion contest by others.[8] PS, DS ¶ 27. There is no evidence in this summary judgment record as to CMM's efforts to promote its marks. Thus, there is little evidence that the strength of CMM's trademarks contributes to a likelihood of confusion.

*Merchants Despatch Transp. Corp.,* 722 F.2d 922, 930–32 (1st Cir.1983).

---

7. Under Local Rule 19, it is not the court's duty to go beyond the parties' statements of material facts. A trial judge cannot comb through every deposition, affidavit, transcript, pleading and interrogatory answer in search of disputed factual issues. The parties are bound by their Rule 19 Statements of Fact and the court's summary judgment decision will be based solely upon facts properly presented therein. *See Stepanischen v.*

8. An examination of the record cited by the parties in their factual statements reveals that the contest was called "Workday Payday"; there is no dispute as to the name or that it was a radio promotion contest.

Considering all the eight factors together, I conclude that no reasonable jury could find a likelihood of confusion based on the facts presented. Whatever potential for confusion can be inferred does not rise above the level shown in *Astra Pharmaceutical*, 718 F.2d 1201, and *Pignons*, 657 F.2d 482, where the First Circuit held that summary judgment was proper. Therefore I GRANT summary judgment to the defendants on the trademark infringement claim.

### FEDERAL UNFAIR COMPETITION— TRADE DRESS INFRINGEMENT

 The First Circuit has said that the analysis of a trade dress claim is similar to a trademark claim—the standard is likelihood of confusion, and the same eight-factor test is applied. *Quabaug Rubber Co. v. Fabiano Shoe Co.*, 567 F.2d 154, 160 (1st Cir.1977). In addition, to be protectible the trade dress must (1) be distinctive or have acquired secondary meaning and (2) be non-functional. *See Two Pesos, Inc. v. Taco Cabana, Inc.*, —— U.S. ——, ——, 112 S.Ct. 2753, 2758, 120 L.Ed.2d 615 (1992).

 CMM has argued in its brief that its trade dress consists of "the employment concept, graphics, layout and look of Payroll Payoff." Plaintiff's Brief at 4. However, just as copyright protection extends only to expressions, not ideas, trade dress protection is not given to marketing concepts or themes. *Woodsmith Pub. Co. v. Meredith Corp.*, 904 F.2d 1244, 1248 (8th Cir.1990); *Haagen– Dazs, Inc. v. Frusen Gladje, Ltd.*, 493 F.Supp. 73, 75 (S.D.N.Y.1980). Thus, the "employment concept" or "employment metaphor" may not be protected.

 CMM also argues that its "graphics, layout, and look" are protectible trade dress alone. Without further help from CMM's brief, I must assume that CMM means the graphics, layout, and look of CMM's Payroll Payoff brochure. I will assume without deciding that CMM has met its burden of showing a genuine factual dispute as to whether the graphic elements of its brochure are distinctive and non-functional. Nonetheless, based on my earlier analysis of the trademark claim, I conclude that there is little likelihood that the sophisticated radio station marketing managers who purchase CMM's expensive promotional services will be confused by the similar brochures as to the source or sponsorship of each.

Unlike the copyright analysis in which I focused on the similarities in the brochures as evidence of copying, I now focus on the brochures as a whole, including their differences, to assess likelihood of confusion. It is not inconsistent to find enough similarities between them to infer that *copying* occurred, yet find enough differences that discerning viewers would not be confused as to the source of each. The "look" of the two brochures differs as follows: WPOR's is mostly blue and red while CMM's is predominantly yellow, with smaller features in green, purple and red, and WPOR's is decorated with a "clock theme" while CMM's features a boot, lariat, and lots of green cash. Many of the similarities are *functional* aspects of a radio promotion brochure and thus not protectible as trade dress: size, folds, tear-off entry form, dollar amount of prize in large type, steps to play, contest rules, information on the music artists the station plays, etc. Comparing the *non-functional* elements of the brochures, I conclude that no reasonable jury could find that the trade dress of the brochures is likely to confuse radio station promotional decisionmakers as to the source of each. Therefore, I GRANT summary judgment to the defendants on the federal unfair competition—trade dress infringement claim.

### STATE LAW CLAIMS

#### Quasi–Contract Claim

 CMM's quasi-contract claim is preempted by federal copyright law. The Maine Law Court has held that the rights enforceable through an unjust enrichment claim under Maine law in the context of a copyright infringement are equivalent to federal copyright law rights. *See Nobel v. Bangor Hydro–Electric Co.*, 584 A.2d 57, 59 (Me. 1990). Since quasi-contract and unjust enrichment are identical causes of action, I hold that CMM's quasi-contract claim is preempted, as a matter of federal law, by the federal copyright statute. 17 U.S.C. § 301. I

GRANT summary judgment to the defendants on Count V, Breach of Quasi–Contract.

### Other State Law Claims

The plaintiff CMM has presented no argument as to its other state law claims. At the end of its arguments on the federal claims, CMM's brief states "[f]or these reasons, and those stated above, summary judgment on the state law claims should not be entered either." Plaintiff's Brief at 4. Because it is not the role of the court to develop the arguments for either party, I shall treat these claims as the plaintiff has—subsumed in the federal claims. Therefore, I GRANT summary judgment to the defendants on Counts IV (state law unfair competition), VI (deceptive and unfair trade practices), and VII (dilution).

### CONCLUSION

Accordingly, the defendants' motion for summary judgment is GRANTED as to Count II (trademark infringement), Count III (federal unfair competition—trade dress infringement), and Counts IV, V, VI and VII (the state law claims). As for Count I (copyright infringement), summary judgment is GRANTED on all aspects of the claim except for infringement of CMM's "KIX Paycheck Payoff" brochure, as to which summary judgment is DENIED. The defendants' motion to exclude CMM's expert witness, Creighton Hoffman, is GRANTED IN PART and DENIED IN PART, limiting his testimony to CMM's actual damages and lost profits and excluding his proffered testimony as to WPOR's profits from the infringement.

So ORDERED.