**THE BUTCHER COMPANY, INC., Plaintiff**

v.

**Guy BOUTHOT and Bouthot Construction, Inc. d/b/a the Odorite Company, Defendants**

No. CIV. 00–139–P–H.

United States District Court, D. Maine.

Jan. 3, 2001.

James C. Hunt, Robinson, Kriger, McCallum & Greene, P.A., Portland, ME, Kirk Teska, Iandiorio & Teska, Waltham, MA, Judah I. Labovitz, Mann, Ungar, Spector & Spector, P.C., Phildelphia, PA, for Plaintiff.

Christopher C. Taintor, Norman, Hanson & Detroy, Portland, ME, Jeffrey M. White, Judah I. Labovitz, Mann, Ungar, Spector & Spector, P.C., Philadelphia, PA, for Defendants.

## ORDER ON ODORITE'S MOTION FOR SUMMARY JUDGMENT

HORNBY, Chief Judge.

Primarily, this is a trademark and trade dress case under the Lanham Act, 15 U.S.C.A. § 1051 *et seq.* It also involves reverse passing-off, false advertising, and various state commercial tort claims. The Butcher Company, Inc. ("Butcher"), is a manufacturer of industrial cleaning supplies, including cleaning solutions, and dilution control and dispensing units for those solutions. Butcher alleges that the defendants, Guy Bouthot and Bouthot Construction, doing business as The Odorite Company ("Odorite"), infringed its trademarks and trade dress by offering competing products with similar names and by copying the color and number-coding system it uses to identify its products. Butcher moved for a preliminary injunction, and Odorite moved for summary judgment.

Butcher's trademark and trade dress claims fail because Butcher has not demonstrated a likelihood that consumers will be confused as to the source of the goods. That is the *sine qua non* of trademark/trade dress infringement. There is no evidence supporting Butcher's other claims except those based upon allegedly false advertising regarding the quality of certain products. Accordingly, Odorite's Motion for Summary Judgment is GRANTED except as to the claim of false advertising on comparability of Powerball and Looking Good; as to that issue, judgment is RESERVED.

## I. FACTS

### A. Defining the Summary Judgment Record

In Butcher's Response to Odorite's Statement of Material Facts it repeatedly denies and qualifies Odorite's factual statements without the record citation required by Local Rule 56(c). Instead, it relies upon assertions that the credibility of the affiant on whose affidavit the statement relies is at stake and the argument that it cannot reply to the motion without further discovery. *See* Pl.'s Resp. to Def.'s Statement of Material Facts ¶¶ 3, 6, 8, 10, 13, 16, 18–23.

■■ Butcher's assertion that credibility issues preclude summary judgment rests on a sentence from the advisory committee's note to the 1963 Amendment to Federal Rule of Civil Procedure 56: "Where an issue of material fact cannot be resolved without observation of the demeanor of witnesses in order to evaluate their credibility, summary judgment is inappropriate." But the First Circuit has stated that it "is well-established that a mere challenge to the credibility of a movant's witnesses without any supporting evidence does not raise a trialworthy issue of fact," and that

> a bare assertion that the opposing party's uncontroverted evidence might be disbelieved is insufficient to resist judgment as a matter of law on an issue as to which the party resisting judgment bears the burden of proof. Were it otherwise, Rule[ ] ... 56 could be rendered virtually useless, merely on the strength of the nonmovant's supposition that the movant's uncontroverted evidence might be disbelieved.

*Favorito v. Pannell,* 27 F.3d 716, 721 (1st Cir.1994) (citations and internal quotation marks omitted); *accord Schoonejongen v. Curtiss–Wright Corp.,* 143 F.3d 120, 130 (3rd Cir.1998) ("[I]f a moving party has demonstrated the absence of a genuine issue of material fact ... concerns regarding the credibility of witnesses cannot defeat summary judgment. Instead, the nonmoving party must present affirmative evidence in order to defeat a properly supported motion for summary judgment."). Here, Butcher has the burden of proof. It therefore cannot avoid summary judgment by merely intoning the mantra "credibility."

Butcher's alternative argument that summary judgment is precluded because it

needs further discovery fails for two reasons. First, Butcher has not complied with Federal Rule of Civil Procedure 56(f), requiring "*affidavits* of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition." Fed.R.Civ.P. 56(f) (2000) (emphasis added); *accord Ricci v. Alternative Energy Inc.*, 211 F.3d 157, 159 n. 1 (1st Cir.2000) ("A party who wishes to forestall ruling on summary judgment because material discovery has not been taken is obliged to file an affidavit under Federal Rule of Civil Procedure 56(f)."). Second, discovery is now complete and Butcher has provided no additional evidence. Therefore, in accordance with Federal Rule of Civil Procedure 56(e) and the corresponding Local Rule, I treat as admitted all facts that Butcher has not properly denied or qualified.

### B. Undisputed Facts

Preliminaries resolved, the following undisputed facts are properly supported by the summary judgment record. Prior to 1998, Odorite distributed Butcher cleaning products. Def.'s Statement of Material Facts (DSMF) ¶ 2. The products included Butcher cleaning solutions and Butcher Command Centers. The Command Centers are wall-mounted devices that hold and dispense the cleaning solutions. DSMF ¶ 2. Butcher's cleaning solutions include Speedball ®, an all-purpose cleaner; Look ®, a glass cleaner; Bath Mate ™, an acid-free washroom cleaner; and Triple Team ™, a citric acid washroom cleaner. DSMF ¶ 8. Each of these cleaning solutions has a particular color and number. DSMF ¶ 8.

Butcher terminated Odorite's distributorship in 1998. DSMF ¶ 4. At that time, Odorite had several Command Centers in inventory. DSMF ¶ 5. Odorite offered to return those Command Centers to Butcher, but Butcher declined the offer. DSMF ¶ 5. Odorite then informed Butcher that Odorite planned on supplying non-Butcher cleaning solutions to facilities with Butcher Command Centers installed. DSMF ¶ 5. Butcher did not respond. DSMF ¶ 5.

In early 1999, Odorite began selling its own line of cleaning solutions. The line includes Powerball, Looking Good, Bath Buddy, and Triple Play, DSMF ¶ 6, which compete, respectively, with Butcher's Speedball ®, Look ®, Bath Mate ™, and Triple Team ™ products. DSMF ¶ 8. Odorite chose the name of each of its products with the intent that it be similar, but not identical, to the name of the competing Butcher product. DSMF ¶ 10. Odorite chose a color and number for each of its products that is the same as the color and number of the competing Butcher product. DSMF ¶ 8. Odorite chose the names, colors, and numbers in this manner to convey comparability to customers and to facilitate use. DSMF ¶¶ 8, 10.

Odorite's representatives consistently make clear to customers that Odorite no longer carries Butcher products but that Odorite has a competing line of comparable products that are less expensive than Butcher's. DSMF ¶¶ 14, 15, 18.[1] Odorite sells its products to "municipal entities, including school districts; owners of office buildings, healthcare facilities, and restaurants; and contract cleaning companies." DSMF ¶ 19. The individuals who make purchasing decisions are "typically maintenance department supervisors, who are closely familiar with the products available

---

1. Butcher's Response to the Defendant's Statement of Material Facts denied this with printouts from Odorite's Internet site that showed Odorite's allegedly infringing products for sale in a manner that did not employ the compare-and-save strategy. In response, Odorite requested and was granted permission to file a supplemental statement of facts, which stated that the appearance of the products on its Internet site was the temporary result of a contractor's mistake and that the products no longer so appear. Butcher did not respond to the supplemental statement, and I therefore deem the facts contained therein admitted.

in the market." DSMF ¶ 19. Odorite sells a dilution control unit manufactured by Knight, and also retrofits Butcher Command Centers so that they accommodate Odorite products. DSMF ¶ 12–13.

Butcher admits that there "is no evidence that any person has ever been confused as to the source of the Odorite dilution control products." DSMF ¶ 21.

## II. DISCUSSION

### A. *Federal Trademark and Trade Dress Claims*

Butcher has asserted trademark and trade dress infringement claims in Counts I and II of its Complaint. In Count I, Butcher alleges that Odorite has infringed Butcher's registered trademarks Speedball® and Look® through the use of the marks Powerball and Looking Good, under 15 U.S.C.A. § 1114(1) (1997 & West Supp. 2000). In Count II, Butcher alleges that Odorite has infringed Butcher's unregistered trademarks Bath Mate™ and Triple Team™ through the use of the marks Bath Buddy and Triple Play, as well as its trade dress,[2] under 15 U.S.C.A. § 1125(a)(1) (1998 & West Supp.2000).

### (1) *Prerequisites to Trademark and Trade Protection*

■ Lanham Act protection of trademark and trade dress has one major purpose: to "avoid[ ] confusion or mistake." *I.P. Lund Trading ApS v. Kohler Co.,* 163 F.3d 27, 36 (1st Cir.1998). In that way it protects both the public and the trademark/trade dress owner. *Id.* Trademarks and trade dress can be protected from infringement if they are: (1) used in commerce; (2) nonfunctional; and (3) distinctive. *Id.* In this case there is no dispute that the marks and the dress have been used in commerce, and that the marks are nonfunctional. Odorite does argue, however, that Butcher's marks are not distinc-

tive, and that Butcher's dress is both functional and not distinctive. I conclude that Butcher's trademarks are distinctive; I assume without deciding that Butcher's trade dress is both nonfunctional and distinctive.

■ There are five ranges in the spectrum of distinctiveness: (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; and (5) fanciful. *I.P. Lund,* 163 F.3d at 39. Generic marks are at the least-protected end of the spectrum; they are "terms that have passed into common usage to identify a product, such as aspirin, and can never be protected." *Boston Beer Co. v. Slesar Bros. Brewing Co.,* 9 F.3d 175, 180 (1st Cir.1993). Descriptive marks are in the middle of the spectrum; a descriptive mark "can be protected, but only if it has acquired a 'secondary meaning' by which consumers associate it with a particular producer or source." *Id.* " 'A term is descriptive if it forthwith conveys an immediate idea of the goods.' " *Equine Technologies, Inc. v. Equitechnology, Inc.,* 68 F.3d 542, 544 (1st Cir.1995) (quoting *Blinded Veterans Ass'n v. Blinded Am. Veterans Found.,* 872 F.2d 1035, 1040 (D.C.Cir.1989)). At the most-protected end of the spectrum "are suggestive, arbitrary and fanciful terms that can be protected without proof of secondary meaning. These terms are considered 'inherently distinctive.' " *Boston Beer,* 9 F.3d at 180. " 'A term is suggestive if it requires imagination, thought and perception to reach a conclusion as to the nature of goods.' " *Equine,* 68 F.3d at 544 (quoting *Blinded Veterans,* 872 F.2d at 1040). "Whether a term is generic, descriptive, or inherently distinctive is a question of fact." *Boston Beer,* 9 F.3d at 180.

■ No reasonable jury could find any of Butcher's marks—Speedball®, Look®, Bath Mate™, and Triple Team™—anything less than suggestive. They are,

---

**2.** Count II does not actually state the basis for the claim, but merely references the first 42 paragraphs of the Complaint. The sentence in the text is based on how the parties treat the Count in their memoranda.

therefore, inherently distinctive and I need not choose among the categories of suggestive, arbitrary, or fanciful. (It is beyond peradventure that they are not descriptive because they simply do not call to mind an "immediate idea of the goods.")

### (2) Infringement

The central issue in Counts I and II is whether Odorite's marks and dress do infringe. Likelihood of confusion as to the source of the product is the gravamen of trademark and trade dress infringement. *See I.P. Lund*, 163 F.3d at 43.

The First Circuit has identified eight factors to be weighed in determining likelihood of confusion:

(1) the similarity of the marks; (2) the similarity of the goods; (3) the relationship between the parties' channels of trade; (4) the relationship between the parties' advertising; (5) the classes of prospective purchasers; (6) evidence of actual confusion; (7) the defendant's intent in adopting its mark; and (8) the strength of the plaintiff's mark.

*I.P. Lund*, 163 F.3d at 43 (citations and internal quotation marks omitted). "No one factor is conclusive as to likelihood of confusion, and the district court must consider each." *Aktiebolaget Electrolux v. Armatron Int'l, Inc.*, 999 F.2d 1 (1st Cir. 1993); *accord Keds Corp. v. Renee Int'l Trading Corp.*, 888 F.2d 215 (1st Cir.1989). Not every factor is always apt in each case. *I.P. Lund*, 163 F.3d at 43; *Int'l Ass'n of Machinists & Aerospace Workers v. Winship Green Nursing Ctr.*, 103 F.3d 196, 201 (1st Cir.1996). Determinations regarding the eight factors and the culminating determination of the likelihood of confusion are factual, but summary judgment is nonetheless appropriate if, "taking the facts before the court and all reasonable inferences therefrom most favorably to" the nonmoving party, no reasonable jury could find in the nonmoving party's favor. *CMM Cable Rep., Inc. v. Ocean Coast Props., Inc.* 888 F.Supp. 192, 200 (D.Me.1995) (Hornby, J.). In this case, to prevail on summary judgment Odorite must demonstrate that no reasonable jury could find a likelihood of confusion.

### (a) The Similarity of the Marks and Dress

Similarity of the marks is determined by examining the "total effect of the designation rather than comparing individual features." *Greentree Labs., Inc. v. G.G. Bean, Inc.*, 718 F.Supp. 998, 1000 (D.Me.1989); *accord Aktiebolaget*, 999 F.2d at 4; *Volkswagenwerk Aktiengesellschaft v. Wheeler*, 814 F.2d 812, 817 (1st Cir.1987). "Words may be recognized as similar because of sound, appearance, and meaning ... and a finding of similarity may be based on appearance alone." *Volkswagenwerk*, 814 F.2d at 817 (citations omitted). The similarity of trade dress is determined by examining the total effect of the dress, not its individual features. *Cf. I.P. Lund*, 163 F.3d at 39 (stating that the inquiry into trade dress distinctiveness "turns on the total appearance of the product, not on individual elements").

In this case, there are obvious similarities in the look and sound of the marks. Each of Odorite's marks shares a word or root with the corresponding Butcher mark ("ball," "look," "bath," and "triple"). Conversely, each of Odorite's marks includes a word different from or in addition to the words in the corresponding Butcher mark. The marks' meanings have vague similarities, both in the abstract and in context. In the abstract, Speedball ® and Powerball both convey a sports image; in context they convey the idea of a particularly fast or effective cleaner. In the abstract Look ® and Looking Good have visual connotations; in context they convey the idea of a spruced up appearance. In the abstract Bath Mate ™ and Bath Buddy convey the same idea; in context they convey the idea of a bathroom cleaner. In the abstract Triple Team ™ and Triple Play both convey a sports image; in context they convey the concept of an effective cleaner. These similarities in meaning

are, however, quite attenuated, and I do not weigh them heavily.

Likewise, there are similarities but also important differences in the trade dress. The labels Butcher uses for its products include the product's name, number, and description, as well as diagrams indicating how the product is used, safety instructions, and the words "Command Center" over a simple logo. Odorite's labels include the same information and similar diagrams, and use a similar layout, but also include an Odorite logo (either "Mr. Odorite," a humanoid figure carrying paint and various cleaning supplies, or "Mr. Powerball," the same figure carrying paint and a bouncing ball). The Odorite labels omit the words Command Center, and include instead the words "Odorite Company" in a bold, stylized font, along with Odorite's address and phone numbers. In Butcher labels, the background is partly black and partly the product's color, and the fonts are primarily white. The Odorite labels use white and the product's color as background, with fonts appearing in the product's color on the white background, and in white on the colored background.

With respect to both the trademarks and trade dress the weight of the similarities is greatly reduced by the prominent appearance of the Odorite name on every product Odorite sells. The clearly displayed name of the manufacturer considerably reduces the likelihood that otherwise similar marks will be confused. *See, e.g., Aktiebolaget*, 999 F.2d at 4–5 (affirming an injunction prohibiting the use of the mark "Leaf Eater" in isolation as infringing the mark "Weed Eater" but allowing its use in conjunction with the words "Flowtron" or "Vornado," on goods that were similar in a broad sense but had dissimilarities in intended use and cosmetics); *Astra Pharmaceutical Products, Inc. v. Beckman Instruments, Inc.*, 718 F.2d 1201, 1206–07 (1st Cir.1983) (noting that the presence of the defendant's house name "Beckman" in conjunction with the brand name "ASTRA" on the defendant's blood analyzer reduced the likelihood that it would be confused as a product of the plaintiff drug maker Astra Pharmaceutical Products, but finding that marks were nonetheless similar for the purposes of summary judgment review); *Pignons S.A. de Mecanique de Precision v. Polaroid Corp.*, 657 F.2d 482 (1st Cir.1981) (finding that while the defendant's mark "Alpha" on a line of cameras was similar to the plaintiff camera manufacturer's mark "Alpa," the total effect of the defendant's mark, which included the prominent appearance of the defendant's name "Polaroid" in close proximity to the mark "Alpha" "minimize[d], if ... not eliminate[d], the possibility that Polaroid's mark might be confused with Pignons"'); *Fisher Stoves, Inc. v. All Nighter Stove Works*, 626 F.2d 193, 194–95 (1st Cir.1980) (finding that appearance of defendant's name on a woodburning stove reduced the likelihood of confusion resulting from similar trade dress, but noting that "display of the manufacturer's name is not always determinative of the confusion issue").

In sum, this factor weighs against finding a likelihood of confusion.

### (b) Similarity of the Goods

The goods are exactly similar, in the sense that each Odorite product serves the same purpose as the corresponding Butcher product. Accordingly, this factor weighs in favor of finding a likelihood of confusion.

### (c) Relationship Between the Parties' Channels of Trade [3]

Channels of trade refer to the distribution methods and markets in which the

---

**3.** Factors three, four, and five—the relationship between the parties' channels of trade, the relationship between the parties' advertising, and the classes of prospective purchasers—are generally treated together in the First Circuit. *Star Fin. Servs., Inc. v. AASTAR Mortgage Corp.*, 89 F.3d 5. 10 & n.3 (1st Cir.1996): *Equine Technologies*, 68 F.3d at 546 & n. 5; *Aktiebolaget*, 999 F.2d at 3 & n. 3. I keep them distinct here because of the relative importance of the classes of prospective purchasers, but I note that the lines between

products are sold. *See Pignons,* 657 F.2d at 488; *Best Flavors v. Mystic River Brewing Co.,* 886 F.Supp. 908, 914–15 (D.Me.1995) (Hornby, J.). In this case, the summary judgment record is inadequate for me to make any firm conclusion regarding the relationship between the parties' channels of trade other than the bare observation that the products have, in some instances competed, with one another. For the purpose of summary judgment, however, I will assume that the products are distributed by the same methods and sold in the same markets, and I therefore weigh this factor in favor of finding a likelihood of confusion.

### (d) Relationship Between the Parties' Advertising

Again, the summary judgment record is inadequate for me to make any firm conclusion regarding the relationship between the parties' advertising. The piecemeal evidence I have before me does not allow for any meaningful comparison. Neither party has produced any evidence regarding whether, for example, they advertise in the same trade magazines, or at the same trade shows. But again, for the purpose of summary judgment, I will assume a strong similarity and I therefore weigh this factor in favor of finding a likelihood of confusion.

### (e) Classes of Prospective Purchasers

This court has noted that "[t]he eight-factor confusion test is not applied to assess confusion in the abstract; it is focused on the likelihood that commercially relevant persons or entities will be confused." *CMM Cable Rep., Inc. v. Ocean Coast Props., Inc.,* 888 F.Supp. 192, 200 (D.Me. 1995) (Hornby, J.); *accord Astra,* 718 F.2d at 1206–07 ("If likelihood of confusion exists, it must be based on the confusion of some relevant person; *i.e.,* a customer or purchaser."). I must consider the possibil-

ity of both point-of-sale confusion and post-sale confusion.

### a. Point–of–Sale Confusion

Bouthot employs a "compare-and-save" marketing strategy and always informs prospective purchasers that Odorite products are different from Butcher products. This weighs very heavily against a finding of a likelihood of confusion. Purchasers who are told that the product they are buying is an Odorite product that is comparable to but less expensive than a Butcher product simply cannot reasonably be confused regarding the product's source.

Odorite also argues that the possibility of point-of-sale confusion is reduced because purchasers in the industry are sophisticated, and their purchases involve an initial expenditure of several hundred dollars. *See* Def.'s Mot. for Summ. J. at 12–13. It is clear that there is "less likelihood of confusion where the goods are expensive and purchased after careful consideration." *Astra,* 718 F.2d at 1206. Thus, in this case, at least with respect to initial purchases when customer relationships are established, the likelihood of confusion is reduced by the expense of the purchase and the sophistication of the purchasers.

### b. Post–Sale Confusion

The inquiry regarding classes of prospective purchasers does not stop at the point-of-sale; I must also consider the possibility of post-sale confusion. *See I.P. Lund,* 163 F.3d at 44; *Chrysler Corp. v. Silva,* 118 F.3d 56, 59 (1st Cir.1997). *See generally* III J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition 23:7 (4th ed.1996). This consideration does not relate to the possibility of confusion at resale, but "rather to the risk that non-purchasers, who themselves may be future consumers, will be deceived." *I.P. Lund,* 163 F.3d at 44. In

these factors are particularly blurry and that some elements could appropriately be dis-

cussed under any of the three factors.

the post-sale context, the focus remains on whether *commercially relevant* persons will be confused. *See I.P. Lund,* 163 F.3d at 44 (noting that the post-sale confusion risk is that "non-purchasers, *who themselves may be future consumers,* will be deceived") (emphasis added); *Astra,* 718 F.2d at 1206 ("If likelihood of confusion exists, it must be based on the confusion of some relevant person; *i.e.,* a customer or purchaser.").

In this case, Butcher argues that there is a likelihood that a variety of people will suffer post-sale confusion, including "janitors who actually use the Defendants products, visiting janitors and purchasing agents, and other people who interact with the Defendants' customers and come into contact with the Defendants' products but do not actually hear the Defendants' 'compare and save' sales pitch."[4] Pl.'s Objection to Def.'s Mot. for Summ. J. at 6. The plaintiff paints two scenarios in which this confusion could arise. In the first, a janitor who uses Odorite products and is dissatisfied with them may believe that they are Butcher products. This janitor's reports back to a supervisor or purchasing agent could result, Butcher argues, in adverse consequences to its reputation and future sales. Pl.'s Objection to Def.'s Mot. for Summ. J. at 7. In the second, a janitor may mistakenly believe that Odorite's products are privately-labeled Butcher products, and "upon changing jobs or receiving a promotion, he may purchase or advocate the purchase of the less expensive 'privately labeled' Odorite products." Pl.'s Objection to Def.'s Mot. for Summ. J. at 7–8.

These possibilities are nothing but speculative. The summary judgment record simply does not include any evidence that the janitors do have influence over buying decisions or that there is any real risk that either of the scenarios the plaintiff fears

will actually come to pass. Butcher has submitted an affidavit which states that training janitors often involves overcoming language and literacy barriers, Swidorski Aff. at ¶¶ 3–4, but it is relevant only to whether janitors may be confused, not to whether their confusion matters—i.e., to whether they are commercially relevant.[5] Because there is no evidence of a likelihood of post-sale confusion among commercially relevant persons, I conclude that it is not a danger in this case.

### (f) Evidence of Actual Confusion

The First Circuit has noted that "[w]hile a showing of actual confusion is not required to establish infringement, an absence of actual confusion, or a negligible amount of it, between two products after a long period of coexistence on the market is highly probative in showing that little likelihood of confusion exists." *Aktiebolaget,* 999 F.2d at 4. Applying this principle, the First Circuit has found that little or no evidence of actual confusion over periods of three and one-half years, *Keebler Co. v. Rovira Biscuit Corp.,* 624 F.2d 366, 377 (1st Cir.1980), four years, *Pignons,* 657 F.2d at 490–91, and six years, *Aktiebolaget,* 999 F.2d at 4, strongly indicate against a likelihood of confusion.

In this case the products have coexisted for one and one-half years. Butcher admits that there is no evidence of actual confusion. It argues, however, that "[a]t this stage in the proceedings" the absence of evidence of actual confusion means that "this factor cannot be applied." Pl.'s Mot. for Prelim. Inj. at 18. Odorite argues that the absence of evidence of actual confusion is "strong evidence that consumers are unlikely to confuse" them. Defs.' Mot. for Summ. J. at 14. I find neither argument convincing: I will apply the factor, but I cannot weigh the absence of evidence of actual confusion too heavily because of

---

4. The record does not describe who "visiting janitors and purchasing agents" are or how they may be confused.

5. Because I find the Swidorski Affidavit irrelevant, I treat Odorite's Motion to Strike it as MOOT.

the relatively short period of time in which the products have coexisted. Accordingly, I find that the absence of evidence of actual confusion weighs in Odorite's favor, but I do not give it the near-determinative weight that the First Circuit has accorded it in cases where the products have coexisted for a long period.

### (g) The Defendant's Intent

The relevant question in weighing the defendant's intent has been phrased in a variety of ways. *E.g., I.P. Lund,* 163 F.3d at 44 (phrasing the question as whether the defendant intended to copy); *Star,* 89 F.3d at 11 (whether the defendant intended to take advantage of the plaintiff's goodwill and promotion efforts); *Keds,* 888 F.2d at 222 (whether the defendant intended to "capitalize on the popularity" of the plaintiff's product); *Aktiebolaget,* 999 F.2d at 3 (whether the defendant acted in "bad faith"); *Astra,* 718 F.2d at 1208 (whether the defendant intended to "deceive . . . or benefit from [the plaintiff's] reputation"). This court has noted that the question is whether the defendant was "trying in any fashion to take advantage of [the plaintiff's] good will, reputation, and market recognition, or whether it was simply using its own name without any such intent." *Best Flavors,* 886 F.Supp. at 917. However the question is phrased, the answer is not very important: the First Circuit has stated that while intent may be probative of likelihood of confusion, *Star,* 89 F.3d at 11, it should not be accorded great weight because, " '[s]trictly, intent, or lack thereof, does not affect the eyes of the viewer.' " *I.P. Lund,* 163 F.3d at 45 (quoting *Silva,* 118 F.3d at 59 n. 3) (alteration in original).

In this case, there is no evidence that Odorite intended to pass off its products as Butcher's: Odorite did not intend to deceive. Odorite does admit, however, that it intended to approximate Butcher's trademarks and used elements of Butcher's trade dress, and that it did so with the intent of conveying to customers the comparability of Odorite's products to Butch-er's products. In that respect, Odorite did intend to take advantage of Butcher's goodwill, reputation, and market recognition. Odorite actions were taken with a view toward facilitating comparison to Butcher's popular products and increasing its own market share. I cannot, however, see how this is any more than marginally probative of a likelihood of confusion. Accordingly, I weigh this factor in Butcher's favor, but not heavily.

### (h) Strength of the Marks

"In assessing a mark's strength, the trier of fact considers evidence of the length of time the mark has been used, its renown in the plaintiff's field of business, and the plaintiff's actions to promote the mark." *Star,* 89 F.3d at 11. The only evidence in the summary judgment record regarding the strength of Butcher's marks and dress is that they have been in use for approximately ten years, and that several hundred thousand units of cleaning solution have been sold. Viewing this evidence in the light most favorable to Butcher, I assume that it is sufficient to make Butcher's marks "strong," and I therefore weigh this factor in favor of finding a likelihood of confusion.

### (i) Review and Conclusion

The factors weighing against finding a likelihood of confusion include: (a) the dissimilarity of the marks, largely because of the presence of Odorite's name on the products; (e) the sophisticated classes of prospective purchasers and their information (with respect to point-of-sale confusion because buyers are always informed that the products are Odorite's, not Butcher's, and with respect to post-sale confusion because there is no evidence that post-sale confusion is a concern in this case); and (f) no actual confusion, because the products have competed for a year and one-half and there is no evidence that anyone has ever been confused. The factors weighing in favor of finding a likelihood of confusion include: (b) the similarity of the goods; (c)

the channels of trade; (d) the relationship between the parties' advertising; (g) Odorite's intent; and (h) the strength of Butcher's marks and dress. Weighing the factors against each other, I conclude that no reasonable jury could find a likelihood of confusion. It is true, of course, that in terms of simple numbers there are only three factors weighing against finding a likelihood of confusion but five factors in favor of finding a likelihood of confusion. Nonetheless, the former are determinative in this case. It would be unreasonable for a jury to conclude that there is a likelihood of confusion as to source where (1) the product bears the Odorite name; (2) all purchasers are told that they are buying an Odorite product, not a Butcher product; (3) there is no evidence of any risk of post-sale confusion; and (4) there is no evidence of actual confusion despite a year and one-half of coexistence. Accordingly, I GRANT Odorite's Motion for Summary Judgment with respect to the trademark and trade dress infringement claims in Counts I and II of Butcher's Complaint.

## B. *Reverse Passing–Off and False Designation of Origin*

In Count III of its Complaint, Butcher alleges that Odorite's placement of its own cleaning solution labels on Butcher Command Center dilution-control dispensing units constitutes "reverse passing-off" (also called reverse palming-off) and "false designation of origin," in violation of Section 43(a) of the Lanham Act, 15 U.S.C.A. § 1125 (1998 & West Supp.2000). ("Passing-off" is trying to make your goods appear to be someone else's; "reverse passing-off" is claiming that someone else's goods are actually yours. *See Lipton v. Nature Co.*, 71 F.3d 464, 474 (2nd Cir.1995); *Web Printing Controls Co. v. Oxy–Dry Corp.*, 906 F.2d 1202, 1203 n. 1 (7th Cir.1990).) Reverse passing-off "may or may not be actionable in the First Circuit." *Big Top USA, Inc. v. Wittern Group*, 998 F.Supp. 30, 52 n. 13 (D.Mass. 1998).[6] Because Odorite has not argued that reverse passing-off is not actionable in the First Circuit, I will assume without deciding that it is.

The claim fails because there is no evidence whatsoever that Odorite has falsely designated the origin of any product. More specifically, there is no evidence that Odorite has ever passed off the Butcher Command Center as its own product: it has not concealed, removed, or obscured the words "Butcher Command Center," which is embossed on the dispensing units.[7] DSMF ¶ 13. The Butcher Com-

**6.** Reverse passing-off is a different claim than one based on the Lanham Act's prohibition against using a "word, name, symbol, or device, or any combination thereof" in a way "likely to cause confusion, or to cause mistake, or to deceive as to the *affiliation, connection, or association* of such person with another person, or as to the . . . *sponsorship[ ] or approval* of his or her goods." 15 U.S.C.A. § 1125(a) (1998 & West Supp.2000) (emphasis added). Butcher's Complaint did not assert the latter claim, but its Response to Odorite's Motion for Summary Judgment asserts that "[w]hether the Defendants' actions of placing their own product labels on dilution control units marked 'Butchers®' and 'Command Center®' fosters confusion" is a trialworthy issue. Even if Butcher had asserted that claim in its Complaint, Butcher's later assertion would be incorrect: the issue is not trialworthy because, in response to Odorite's argument that all it has done is label products accurately, Butcher has not produced any evi-

dence that Odorite's actions do confuse commercially relevant consumers as to affiliation, connection, association, sponsorship, or approval.

**7.** In its Response to the Defendant's Statement of Material Facts, Butcher denies Odorite's assertion that it has never covered up, obliterated, or removed the words "Butcher's Command Center" on the Butcher dilution control units. Butcher's denial cites Paragraph 36 of the Complaint. The Complaint does not support that denial: it states that Odorite has covered up Butcher's cleaning solution product labels on Butcher Command Centers, not that Odorite has done anything to the words Butcher Command Center on the units themselves. Moreover, in its Response to the Defendant's Motion for Summary Judgment, Butcher asserts that "[w]hether the Defendants' actions of placing their own product labels on dilution control units marked 'Butchers®' and 'Command

mand Center is, in essence, a container. It has places on it to affix labels indicating the products it contains. No reasonable jury could find that the fact that Odorite has replaced Butcher's product labels with its own product labels—so that the dilution control units accurately indicate the products they contain—falsely designates the origin of the Command Center when the Command Center itself bears the words "Butcher Command Center." The cleaning solution labels clearly indicate the source of the cleaning solutions and only the source of the cleaning solutions; they simply do not indicate the origin of the dilution control unit. Moreover, there is no evidence whatsoever that Odorite has ever put its own labels on Butcher Command Centers that actually do contain Butcher cleaning solutions. I GRANT Odorite's Motion for Summary Judgment on Count III.

### C. The Lanham Act False Advertising Claim

In Count IV of its Complaint, Butcher alleges that Odorite has engaged in false advertising in violation of Section 43(a) of the Lanham Act, 15 U.S.C.A. § 1125(a) (1998 & West Supp.2000). Butcher bases its false advertising claim on assertions that Odorite has falsely represented on a cost comparison sheet that it offers an "Odorite Dilution Control Unit" for sale,[8] and that it has falsely represented that its products are comparable in quality to Butcher's. Odorite responds that it does offer a dilution control unit for sale, albeit one manufactured by Knight, and that its products are comparable in quality to Butcher's.

[■] I conclude that the words "Odorite Dilution Control Unit" on the cost comparison sheet are not false on their face because they do not explicitly or implicitly claim that the unit is *manufactured* by Odorite. The words appear on the cost-comparison sheet only incidentally; the sheet is not directed at selling dilution control units, but rather the associated cleaning solutions, and there is no price for or description of the unit. To the extent any implication can be drawn that Odorite offers for sale a dilution control unit, it is just that: that Odorite offers for sale *a* dilution control unit, not necessarily its own brand of dilution control unit. And that implication is true: Odorite offers a Knight unit for sale.

On the other issue—the comparable quality of Odorite products to Butcher's, Odorite has submitted the affidavit of its owner and president, Guy Bouthot, that the products are comparable. Butcher has responded by submitting the affidavit of an expert, Michael Atwater, who opines that Butcher's products Look® and Speedball® are in some ways equivalent and in some respects superior to Looking Good and Powerball. Odorite has moved to strike Atwater's affidavit on the grounds that Butcher did not designate him as an expert in accordance with the scheduling order. I DENY Odorite's motion. To support its summary judgment motion. Odorite offers Bouthot's affidavit that the products are comparable. Odorite failed to designate Bouthot as an expert. Either his testimony is expert and likewise subject to being stricken or neither affidavit is expert testimony. (I do not thereby de-

Center®' fosters confusion" is a trialworthy issue. Thus, my understanding is that Butcher's reverse passing-off claim is based on Odorite's placement of its own cleaning solution labels on Butcher Command Centers, not that Odorite has done anything to the words on the units themselves.

8. The only evidence of this that Butcher has offered is an Odorite "cost comparison sheet." *See* Pl.'s Mot. for Prelim. Inj. at 26; Sferes Aff. Ex. 2. The comparison sheet is headed "Odorite Dilution Control Unit vs. Butchers Command Center Cost Comparison," below which appears a table listing prices for cases of Odorite and Butcher products. The table facilitates cost comparison of the cleaning solutions by breaking out the cost per gallon and/or the cost per quart of each product. The sheet contains no other representations whatsoever; it does not indicate a price for the "Odorite Dilution Control Unit" nor describe the unit in any way.

cide that comparability is a matter for expert testimony.)

Thus, there is a dispute as to whether Looking Good and Powerball are comparable in quality to Look® and Speedball®. Is it a genuine issue of material fact? The assertion that products are "comparable" in quality may well be nonactionable "puffery." *See* 4 McCarthy on Trademarks and Unfair Competition § 27:38 (4th ed. 1996) (" 'Puffing' may ... consist of a general claim of superiority over a comparative product that is so vague, it will be understood as a mere expression of opinion. For example, vague advertising claims that one's product is 'better' than that of competitors' can be dismissed as mere puffing that is not actionable as false advertising."); *Nikkal Indus., Ltd. v. Salton, Inc.*, 735 F.Supp. 1227, 1234 n. 3 (S.D.N.Y.1990) (noting that a statement that one product was "better" than its competitors was "mere 'puffing' " and "not actionable as false advertising"). The parties have not briefed that issue, and I will not construct arguments for them. If this case is not otherwise resolved within three weeks, however, I invite supplemental briefing on the false advertising issue as it relates to "comparability," such briefs to be filed by January 26, 2001.

■■■ With respect to the false advertising claim based on Odorite's representations that Bath Buddy and Triple Play are comparable to Bath Mate™ and Triple Team™, I GRANT Odorite's Motion for Summary Judgment. The Atwater Affidavit does not address these products, and Butcher has not presented any other evidence disputing Odorite's representations.

### D. The Maine Common Law Trademark, Trade Dress, and Unfair Competition Claims and the Maine Deceptive Trade Practices Claim

The parties have treated the Maine common law trademark, trade dress, and unfair competition claims asserted in Count V of the Complaint, as well as the Maine Deceptive Trade Practices Act claim under 10 M.R.S.A. § 1212 (1997), asserted in Count IX, as identical to the Lanham Act claims. I do the same. Accordingly, I GRANT Odorite's Motion for Summary Judgment on Counts V and IX of the Complaint except to the extent they are based on the false advertising issue discussed *supra* in Part II.C. of this Order.

### E. Unlawful Interference with Contractual Relations and Unlawful Interference with Advantageous Business Relations

■■■ In Count VI of its Complaint Butcher asserts claims for unlawful interference with contractual relations and unlawful interference with advantageous business relations. In Maine, "[t]o succeed on a tortious interference claim, [the plaintiff must] establish (1) 'the existence of a valid contract or prospective economic advantage;' (2) 'interference with that contract or advantage through fraud or intimidation;' and (3) 'damages proximately caused by the interference.' " *Gordan v. Cummings*, 756 A.2d 942, 946 (Me.2000) (quoting *James v. MacDonald*, 712 A.2d 1054, 1057 (Me.1998)). Butcher has entirely failed to respond to Odorite's argument that Butcher has not presented any evidence of fraud or intimidation. Accordingly, I consider these claims abandoned and I GRANT Odorite's Motion for Summary Judgment on Count VI of the Complaint.

### F. The Trespass to Personal Property and Conversion Claims

■■■ Butcher asserts trespass to chattel and conversion claims in Counts VII and VIII of its Complaint. Neither party has alerted me to any difference between these torts that is relevant to this case, and I treat them identically. The claims are based on the fact that Odorite reconfigured Butcher Command Centers to accommodate Odorite products. Evidently, the reconfigured Command Centers are the ones that Odorite had purchased prior to the time Butcher terminated its distributorship. Odorite retained these units with Butcher's permission.

The Maine Law Court has stated that the " 'gist of conversion is the invasion of a

party's possession or right to possession'" of goods. *Withers v. Hackett,* 714 A.2d 798, 800 (1998) (quoting *Gen. Motors Acceptance Corp. v. Anacone,* 160 Me. 53, 197 A.2d 506, 524 (1964)). It has articulated three

> necessary elements to make out a claim for conversion ...: (1) a showing that the person claiming that his property was converted has a property interest in the property; (2) that he had the right to possession at the time of the alleged conversion; and (3) that the party with the right to possession made a demand for its return that was denied by the holder.

*Withers,* 714 A.2d at 800. The third element is only necessary, however, if the holder took the property rightfully. *Id.* Generally, trespass to personal property involves dispossessing another of the property or interfering with another's present or future possession of the property. Restatement (Second) of Torts §§ 217–220 (1965).

In this case, there is no evidence in the summary judgment record that Butcher owned the Command Centers, that it had any right to possession of the reconfigured Command Centers, or that it made a demand for their return that Odorite denied. They simply were not Butcher's property. Thus, Butcher has not satisfied any of the three conjunctive elements of the tort of conversion, nor the right to possession required for trespass to personal property. Accordingly, I GRANT Odorite's Motion for Summary Judgment on Counts VII and VIII of Butcher's Complaint.

### III. CONCLUSION

I GRANT Odorite's Motion for Summary Judgment on all claims in the Complaint

except the false advertising claim based on the representation that Looking Good and Powerball are comparable in quality to Look® and Speedball®, on which judgment is RESERVED. I DENY Odorite's Motion to Strike the Affidavit of Michael Atwater, and I treat as MOOT Odorite's Motion to Strike the Affidavit of Laura Swidorski. Finally, because Butcher's Motion for Preliminary Injunction did not raise Odorite's allegedly false representations regarding the comparable quality of its products as grounds for the motion, and because no other claims remain, I treat it as MOOT.[9]

SO ORDERED.

9. I note that the section addressing the false advertising claim in Butcher's Motion for Preliminary Injunction alleges that Odorite's use of the numbers one, two, sixteen, and nineteen to designate its products constitutes a false representation that it sells nineteen products. That allegation does not, however, appear in the false advertising count of Butcher's Complaint. The passing reference to the allegation that is made in the general introductory section of the Complaint, *see* ¶¶ 34–35, is insufficient to put Odorite on notice of the claim, as evidenced by the fact that Odorite did not discuss it in its Motion for Summary Judgment. Therefore, whatever dubious merit the claim may have, I do not consider it because it was not adequately pleaded.