# United States Court of Appeals
## For the First Circuit

No. 00-1641

NORTHERN LIGHT TECHNOLOGY, INC.,

Plaintiff, Appellee,

v.

NORTHERN LIGHTS CLUB, JEFFREY K. BURGAR, AND
641271 ALBERTA LTD., D/B/A NORTHERN LIGHTS CLUB,

Defendants, Appellants.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Douglas P. Woodlock, U.S. District Judge]

Before

Selya, Boudin and Stahl,
Circuit Judges.

Eric C. Grimm, with whom CyberBrief, PLC, Theodore A. Lund,
and Gaeta, Courville & Lund, were on brief for appellant.
Bernard J. Bonn, III, with whom Barry S. Pollack, and
Dechert Price & Rhoads, were on brief for appellee.

January 8, 2001

**STAHL, Circuit Judge**.  This case involves a dispute over the simultaneous use of two similar Internet domain names by two separate entities.  Defendants-appellants Northern Lights Club, Jeff Burgar and 641271 Alberta Ltd. (collectively "Northern Lights" or "defendants") appeal a preliminary injunction entered by the district court requiring the posting of a specified disclaimer on their World Wide Web site's portal page.  The court entered the injunction after finding that plaintiff-appellee Northern Light Technology, Inc. ("Northern Light" or "plaintiff") was likely to prevail on the merits of its state and federal trademark claims and its claim under the Anticybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d) ("ACPA").

Defendants assert three bases for relief in this interlocutory appeal: (1) that the district court lacks personal jurisdiction, and hence the power to enjoin them; (2) that the district court erred in concluding that the plaintiff was likely to succeed on the merits of its claims; and (3) that the injunction currently in place is overly broad and consequently infringes their free-speech rights.  Finding that the district court properly acquired jurisdiction over defendants when their agent was served with process within the forum state, and discerning no basis for disturbing the district court's

determination on the likely success of plaintiff's suit, we uphold the district court's issuance of a preliminary injunction.  And because defendants only obliquely pressed their First Amendment argument before the district court, we decline to decide the issue for purposes of this appeal.

## I. Background

The facts of this case are extensively chronicled in the district court's opinion, see Northern Light Tech., Inc. v. Northern Lights Club, 97 F. Supp. 2d 96 (D. Mass. 2000), and so we confine our discussion to the events relevant to this appeal.  On September 16, 1996, plaintiff registered the Internet domain name northernlight.com with Network Solutions, Inc. ("NSI"), which at that time was the organization exclusively entrusted with the task of registering domain names on the World Wide Web.[1]  Plaintiff also filed registration papers for the "Northern Light" service mark with the United States Patent and Trademark Office ("PTO") during that same month.[2]  Nearly a year later, in August 1997, plaintiff began its operation of the

_____

[1] As they are commonly used today, Internet domain names serve two principal functions: (1) providing the addresses for hypertext markup language ("HTML") sites on the World Wide Web, and (2) permitting the dissemination of e-mail accounts with a common suffix that reflects the identity of the accounts' proprietor.

[2] The PTO issued plaintiff a registered trademark for "Northern Light" on February 23, 1999.

-4-

northernlight.com website (and, consequently, its use of the "Northern Light" mark in commerce) as a search engine. Search engines are popular Web-retrieval tools that match a search query submitted by an Internet user with the websites whose content best corresponds to the submitted search terms. The northernlight.com site has remained in continuous existence as a search engine since August 1997.

Defendant Jeff Burgar, a resident of High Prairie, Alberta, Canada, is the president and principal shareholder of 641271 Alberta, Ltd., an Alberta corporation that owns the northernlights.com domain name. Burgar, a self-described "Internet entrepreneur," has, since the mid-1990s, registered thousands of "catchy" domain names – i.e., Internet addresses appropriating, in identical or slightly modified form, the names of popular people and organizations. He is also the president of Northern Lights Club, an unincorporated association with a listed address in Las Vegas, Nevada. While Northern Lights Club's stated mission is to bring together devotees of the Northern Lights, or aurora borealis, including businesses that take their name from the famous celestial phenomenon, Burgar's testimony indicates that the club has no actual individual members.

In October 1996, approximately one month after plaintiff registered its northernlight.com website, Burgar, on behalf of Northern Lights Club, registered the northernlights.com domain name with NSI.[3] Soon after registration, Burgar licensed the name to FlairMail, a vanity e-mail service that he manages and that is owned by a local Alberta newspaper.[4] Burgar "believes" that this newspaper is owned by his wife. Under this arrangement with FlairMail, defendants offered e-mail accounts under the northernlights.com domain name that users could access through some other website, such as flairmail.com, although Internet users who attempted to visit the northernlights.com page on the World Wide Web would find that no such site existed.[5]

The two similar domain-name registrations enjoyed a peaceful coexistence until March 2, 1999, when a USA Today story

---

[3]Plaintiff does not allege that defendants had actual knowledge of the northernlight.com registration when they registered the northernlights.com domain name.

[4]Vanity e-mail permits a subscriber to choose both the user name and the domain name for their e-mail address. To use as an example the service offered by defendants, an admirer of the aurora borealis named John Doe could choose the vanity e-mail address "John.Doe@northernlights.com."

[5]The district court found, at the time of its March 2000 opinion, that approximately 112 individuals used the northernlights.com domain name as part of their vanity e-mail address. See 97 F. Supp. 2d at 101.

on Internet search engines erroneously identified plaintiff's website as northernlight<u>s</u>.com. After ascertaining that defendants were the owners of this domain name, plaintiff's marketing director contacted Burgar to find out whether defendants might be interested in selling it. The parties exchanged a series of proposals and counterproposals by e-mail over a two-month period but ultimately no sales or licensing agreement was consummated. Soon thereafter, in April 1999, defendants posted an active page on the northernlights.com World Wide Web site. Visitors to the site saw, among other things, a site-search function near the top of the screen that enabled users to perform a search of the northernlights.com site for specific words or phrases, as well as links to FlairMail and other members of the "Northern Lights Community." Plaintiff's Web site was placed third in the list of the Northern Lights Community "Business Listings."[6] Plaintiff had not agreed to this listing.

On July 14, 1999, plaintiff sent Burgar a cease-and-desist letter, demanding that the northernlights.com site be deactivated. Defendants chose not to respond to this letter.

---

[6]Plaintiff asserts that it received approximately 300 referrals per day from defendants' site about the time that the northernlights.com site went online, and that this number later increased to several thousand referrals per day.

Fifteen days later, plaintiff asked NSI to strip defendants of the northernlights.com domain name based on the similarity of their respective marks, but NSI declined, citing the one-letter discrepancy between the name of defendant's website and plaintiff's trademark.  On August 6, 1999, plaintiff filed the instant lawsuit under federal and state theories of unfair competition, trademark infringement, and trademark dilution.  In its complaint, plaintiff sought both a temporary restraining order and a preliminary injunction.  In December 1999, plaintiff amended its complaint to add a claim under ACPA (which had been enacted into law less than one month earlier) and to abandon its federal trademark-dilution claim and its state-law claims of unfair competition and trademark dilution.

Moments before the district court hearing on September 1, 1999 to consider the merits of plaintiff's claims and the court's personal jurisdiction over defendants, plaintiff's agent physically served process upon Burgar, who had traveled voluntarily to Boston from Alberta to witness the proceedings and to make himself available for testimony if needed.  Although the hearing itself focused largely on the convoluted issues of personal jurisdiction arising from Internet activities, it also touched upon the merits of plaintiff's request for preliminary injunctive relief.  At the end of the hearing, the district

-8-

court indicated that it would issue a temporary restraining order modifying the content of the northernlights.com site to prevent further public confusion, and solicited advice from both parties as to the appropriate substance of that order.

True to its word, the district court imposed the TRO the following day, stating that Northern Light had successfully demonstrated probable personal jurisdiction, that it would be likely to succeed in its trademark-infringement suit, and that the balance of hardships and the public interest favored temporary relief. The court ordered that defendants remove all content from the northernlights.com site and post in its place a blacked-out screen containing only an image of the aurora borealis and links to three websites: (1) flairmail.com (where users could access their northernlights.com e-mail accounts); (2) plaintiff's northernlight.com site; and (3) the content page that formerly existed at northernlights.com, to be described, for purposes of the link, as "BUSINESSES THAT ARE LISTED WITH THE NORTHERN LIGHTS COMMUNITY." On the same day that this ruling was issued, the parties jointly moved the court for a continuance of "at least 60 days." In this joint motion, defendants acquiesced in an extension of the restraining order against them until discovery and further hearings in the matter were conducted, and the parties agreed to a schedule governing

the completion of discovery and the filing of any additional motions. The court granted this motion, and both parties submitted further motions during this period. After granting several motions for extensions of time, the district court ultimately held hearings on January 19 and 21, 2000 on the personal-jurisdiction issue and the merits of plaintiff's request for preliminary relief.

In its written opinion issued on March 31, 2000, the district court ordered, inter alia, that what had become a de facto preliminary injunction should remain in place.[7] In so doing, the court began by holding that it had personal jurisdiction over defendants.[8] It determined that plaintiff had satisfied sections 3(c) and 3(d) of the Massachusetts Long-Arm Statute, see Mass. Gen. Laws ch. 223A, § 3, because defendants

---

[7]The record does not clearly reveal when the TRO became a preliminary injunction. At some point following the submission of their joint motion for continuance, the parties (and the district court) started describing the TRO as a preliminary injunction. Furthermore, in its written opinion, the district court stated that the preliminary injunction already in place would not be modified. In any event, the present appeal clearly is from a preliminary injunction.

[8]The district court noted that its decision was responsive to a plethora of pretrial motions pending before it, including motions to dismiss for lack of personal jurisdiction and for failure to state a claim; plaintiff's initial motion for a preliminary injunction; defendants' motions for reconsideration of the temporary relief that had already been ordered; and the parties' motions to compel discovery and to impose sanctions. See 97 F. Supp. 2d at 98.

had likely caused tortious injury to plaintiffs in Massachusetts, both through their acts within the Commonwealth (in the form of their trademark-infringing website) and their regular solicitation of business through acts outside of the Commonwealth (by virtue of, inter alia, the site's "entice[ment]" to users to post material). See 97 F. Supp. 2d at 104-06. The court also found that defendants had sufficient contacts with Massachusetts to support the exercise of specific jurisdiction under International Shoe Co. v. Washington, 326 U.S. 310 (1945), thereby satisfying the constitutional due-process element of personal jurisdiction. See Northern Light Tech., Inc., 97 F. Supp. 2d at 106-08.

On the merits of plaintiff's suit, the district court found that, based on the likelihood of confusion between the two websites because of their similar form and function, plaintiff's state and federal trademark-infringement and unfair-competition causes of action would probably succeed. See id. at 109-15, 120. The court further opined that plaintiff was likely to succeed on its ACPA claim, based on the confusing similarity of the two domain names and proof of defendants' bad-faith intent to profit from plaintiff's northernlight.com mark. See id. at 115-20. On the latter issue, the court reasoned that, although Burgar's initial reluctance to sell the northernlights.com site

-11-

and defendants' uninterrupted use of the northernlights.com name for vanity e-mail accounts militated against a bad-faith finding, defendants' historical practice of "targeting trademarked names, creating fictional entities to register them, and offering dubious explanations for the selection of these domain names" ultimately tipped the scales in favor of such a preliminary determination. Id. at 119. Finally, the district court found that plaintiff had established a likelihood of irreparable harm, that the balance of hardships favored the plaintiff, and that the public interest favored the preservation of the preliminary injunction already in place. See id. at 120-21.

On appeal, defendants dispute the district court's personal-jurisdiction ruling and aspects of its decision regarding the likelihood of plaintiff's success on the merits. Defendants also pursue their argument, not expressly considered by the district court, that the present injunction unduly burdens their First Amendment rights.

## II. Personal Jurisdiction

Defendants first challenge the injunction entered by the district court on the ground that the court was without personal jurisdiction to order such a remedy. At each stage of the proceedings, the parties have contested whether defendants'

activities, both in terms of the content of their website and their discussions with the plaintiff regarding a potential business venture, meet the personal-jurisdiction criteria of the Massachusetts Long-Arm Statute and the requirements of due process.  Plaintiff also posited a more conventional basis for personal jurisdiction in the district court – namely, the service of process effected upon Burgar just prior to the September 1, 1999 preliminary injunction hearing.  We afford plenary review to the district court's determination of personal jurisdiction, and may affirm its judgment for any independent reason supported by the record.  See, e.g., Phillips Exeter Acad. v. Howard Phillips Fund, Inc., 196 F.3d 284, 288 (1st Cir. 1999).

The district court expressly declined to consider the validity of personal jurisdiction based on physical service of process.  See 97 F. Supp. 2d at 108 n.12.  On appeal, however, plaintiff continues to press its case that, under the doctrine of transient jurisdiction, it has satisfactorily created jurisdiction through its service of process on Burgar prior to the September 1, 1999 hearing.  See Burnham v. Superior Court of Cal., 495 U.S. 604 (1990) (plurality opinion); Schinkel v. Maxi-Holding, Inc., 565 N.E.2d 1219, 1222-23 (Mass. App. Ct. 1991) (holding that personal jurisdiction in Massachusetts need not be

predicated on Long-Arm Statute when defendant served with process while in forum under transient-jurisdiction doctrine). Defendants dispute this proposition, claiming that this method of service of process is fundamentally unfair in that it represents a trap for the unwary litigant who travels to the forum state solely to contest the issue of personal jurisdiction. Defendants also argue that permitting service of process under these circumstances is unwise from a public-policy perspective in that it discourages the litigant from actively assisting the district court in the jurisdictional- discovery process.

Although they do not specifically ask for process immunity, defendants' argument against personal jurisdiction essentially boils down to a request that Burgar be deemed immune from service of process since, at the time he was served, he was present in Massachusetts only for the purpose of attending a personal-jurisdiction hearing in this lawsuit. This argument enjoys some measure of historical pedigree, albeit in a related context. Long before the Supreme Court in <u>Burnham</u> affirmed that personal jurisdiction can be sustained against a defendant solely on the basis of his presence in the forum state at the time of service of process, it had recognized that <u>some</u> parties temporarily in the forum state enjoy immunity from service by

-14-

virtue of their status as participants in ongoing litigation. For instance, in Lamb v. Schmitt, 285 U.S. 222 (1932), the Court noted the potential peril of allowing an individual who is attending a proceeding in one suit to be served with process in conjunction with another:

> [T]he due administration of justice requires that a court shall not permit interference with the progress of a cause pending before it, by the service of process in other suits, which would prevent, or the fear of which might tend to discourage, the voluntary attendance of those whose presence is necessary or convenient to the judicial administration in the pending litigation.

Id. at 225 (internal citations omitted). Similarly, Justice Scalia's plurality opinion in Burnham referred to several states' historical imposition of statutory or common-law prohibitions on the service of process of those individuals present in the forum as parties or witnesses in unrelated judicial proceedings – a practice that led him to conclude that transient jurisdiction comported with constitutional due process. See 495 U.S. at 613.

Accompanying the courts' repeated recognition of the validity of the party/witness immunity exception, however, has been a persistent acknowledgment of the exception's limitations. The Lamb Court itself noted that, because the privilege exists for the convenience of the district court in its exercise of

-15-

judicial administration, rather than to protect the individual seeking to avoid service of process, courts enjoy the discretion to confer (or deny) immunity in such instances. See 285 U.S. at 225 (citing Stewart v. Ramsay, 242 U.S. 128, 130 (1916)). Just as importantly, the extension of the privilege has been limited by the majority of courts to cases in which the party or witness was participating in an unrelated litigation at the time that he was served with process in the forum state. See, e.g., ARW Exploration Corp. v. Aguirre, 45 F.3d 1455, 1460 (10th Cir. 1995) (denying process immunity where party was served with process in second lawsuit while attending deposition in first lawsuit alleging similar facts); In re Fish & Neave, 519 F.2d 116, 118 (8th Cir. 1975) (similar); LaCroix v. American Horse Show Ass'n, 853 F. Supp. 992, 994-95 (N.D. Ohio 1994) (applying Lamb and denying defendants' claim of entitlement to immunity based on appearance in forum state solely to contest personal jurisdiction); 4 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1080, at 511 (2d ed. 1987) ("There is generally no immunity from service of process when the suit in which immunity is sought is part of, or a continuation of, the suit for which the person claiming immunity is in the jurisdiction."); see also Lamb, 285 U.S. at 225 ("[T]he [process-immunity] privilege should not be enlarged beyond the

reason upon which it is founded, and . . . should be extended or withheld only as judicial necessities require.").[9] The rationale for the differing-lawsuit prerequisite to process immunity in this context is relatively straightforward: while a court can, in cases before it, choose to protect the jurisdictional status of a party or witness who is reluctant to come to the forum state by issuing protective orders or subpoenas, it cannot wield such power in other cases. The process-immunity exception therefore fills the gap only where it needs to be filled – that is, in cases where a district court wishes to shield an individual from service of process to encourage his or her travel to the forum state, but would be unable to do so absent the power to grant immunity.

_____

[9]In their brief, defendants cite to other cases, such as American Centennial Ins. Co. v. Handal, 901 F. Supp. 892, 895 (D.N.J. 1995), which interpret Lamb differently. Those cases hold that process immunity should be granted to non-residents present in the forum state to participate in any litigation, whether or not related to the suit for which the disputed service has been effected, as long as such immunity does not obstruct justice in the first suit. See, e.g., Shapiro & Son Curtain Corp. v. Glass, 348 F.2d 460, 461-62 (2d Cir. 1965); NASL Marketing, Inc. v. de Vries, 94 F.R.D. 309 (S.D.N.Y. 1982); United Nations v. Adler, 90 F. Supp. 440, 441 (S.D.N.Y. 1950). We reject this view, as Lamb definitively retains the distinction between presence in the forum state for related and unrelated cases. See 285 U.S. at 225 ("[T]he due administration of justice requires that a court shall not permit interference with the progress of a cause pending before it by the service of process in other suits . . . .") (emphasis added).

Turning to the facts of this case, several features of defendants' litigation posture counsel against a finding that Burgar is entitled to process immunity. First, and most apparent, is the fact that defendants have never asked the district court for such immunity on behalf of Burgar, either prior to or following the hearing at which Burgar was served with process. In lieu of a specific request for immunity, defendants instead have asked this court to fashion a broad, per se rule precluding the exercise of personal jurisdiction whenever the served individual is in the jurisdiction to attend litigation-related proceedings that pertain to him or her. In light of the admonitions in Lamb and other cases that process immunity should be meted out sparingly, we reject this suggestion. Moreover, the circumstances surrounding the service of process on Burgar are not those that would ordinarily favor a finding of immunity even in a case where it had been timely requested. Specifically, Burgar voluntarily entered into Massachusetts to attend proceedings as a spectator in the same case in which he was served with process. While we need not decide the issue, it seems apparent that under these facts, the district court would have faced a relatively heavy presumption against granting such immunity if it actually had been sought by Burgar.

For these reasons, we hold that the district court properly exercised personal jurisdiction over defendants in this case.[10]  Based on this determination, we need not reach the alternate bases for personal jurisdiction discussed in the district court's opinion.

### III. Plaintiff's Likelihood of Success on the Merits

Defendants' second claim in this appeal, which goes to the merits of plaintiff's suit, is that the preliminary injunction should be dissolved because it is premised on erroneous findings by the district court.  Specifically, defendants claim that the court erred as a matter of fact in determining that Northern Lights manifested a bad-faith intent to profit from plaintiff's mark, and as a matter of law in concluding that ACPA should be applied retroactively to encompass defendants' behavior prior to the enactment of the statute.

---

[10]We believe that the service of process effected upon Burgar  also conferred personal jurisdiction over the other defendants. Burgar serves as the president of both Northern Lights Club, an unincorporated association, and 641271 Alberta, Ltd., a foreign corporation.  See Fed. R. Civ. P. 4(h)(1) (permitting personal service of process upon officers of unincorporated associations and foreign corporations).

In all events, defendants have attacked the efficacy of service of process only in general.  They have not attacked its efficacy vis-à-vis particular defendants. Consequently, we deem waived any possible argument that personal service upon Burgar was ineffectual as a means of bringing Northern Lights Club and/or 641271 Alberta, Ltd. before the court.

## A. Defendants' Bad Faith

Defendants vehemently contest the district court's finding that the registration and maintenance of the northernlights.com domain name represented a bad-faith effort to profit from plaintiff's Northern Light trademark. The issue of bad faith is principally relevant to the merits of plaintiff's suit insofar as "bad faith intent to profit from [another's] mark" constitutes an essential element of the cause of action under ACPA. 15 U.S.C. § 1125(d)(1)(A)(i). In this case, however, it also relates, albeit tangentially, to plaintiff's trademark-infringement claim. This is so because the district court's finding with respect to defendants' intent in adopting the Northern Lights mark, which the court rendered while considering one of the eight factors under the "likelihood-of-confusion" test for trademark infringement, see, e.g., I.P. Lund Trading ApS v. Kohler Co., 163 F.3d 27, 43 (1st Cir. 1998), expressly incorporated by reference the intent findings it had made in its ACPA analysis. See 97 F. Supp. 2d at 114. Thus, we must consider the court's "bad-faith intent to profit" findings to the extent that they bear on the trademark-infringement claim. We review the district court's finding of bad faith for clear error. See American Bd. of Psychiatry & Neurology v. Johnson-Powell, 129 F.3d 1, 3 (1st Cir. 1997) (noting clear-

-20-

error standard of review applies to findings of fact made in conjunction with ruling on motion for preliminary injunction) (citing Keds Corp. v. Renee Int'l Trading Corp., 888 F.2d 215, 222 (1st Cir. 1989)).

On appeal, defendants claim that their conduct did not meet the statutory guidelines for a finding of bad faith, and that even if it did, the subjective and objective reasonableness of their actions should shield them from liability. Defendants stress that their mere registration of multiple domain names does not, by itself, indicate that they were acting in bad faith with regard to any of their individual registrations or website uses. Defendants also assert that the statements of Burgar have been taken out of context by the district court, and have been unfairly used to establish Northern Lights's bad faith.

Along with its inclusion of bad faith among the essential elements of the ACPA cause of action, Congress provided nine nonexhaustive guideposts that courts may use to divine whether or not bad faith exists. See 15 U.S.C. §§ 1125(d)(1)(B)(i)(I)-(IX). In addition, the statute provides an "escape clause" to those whose conduct would otherwise constitute bad faith if the potential infringer "believed and had reasonable grounds to believe that the use of the domain name was a fair use or otherwise lawful." Id. §

-21-

1125(d)(1)(B)(ii). In this case, the district court determined that defendants' myriad explanations for their use of the northernlights.com site – e.g., as an experimental new business model, as a site for aurora borealis admirers, and as a compilation of businesses that contain the phrase "Northern Lights" – undermined Northern Lights's claim of subjective belief in fair use, and hence their entitlement to the "escape clause" of § 1125(d)(1)(B)(ii). See 97 F. Supp. 2d at 118-19. Additionally, the court concluded that the defendants' numerous registrations of domain names containing the trademarks of others, which defendants accomplished in some cases by creating fictional "fan clubs" so that they could present a mantle of legitimacy in their registration requests to NSI, represented powerful evidence of defendants' bad faith in operating the northernlights.com site. This conclusion of bad faith was reinforced, according to the district court, by defendants' history of disregarding cease-and-desist letters from legitimate trademark owners, and their apparent openness to sell the northernlight.com registration to the plaintiff at the right price. Id. at 119-20.

Based on our review of the record, we see no clear error in the district court's finding that defendants will likely be found to have acted in bad faith in operating the

northernlights.com site.[11]  Although defendants are correct in asserting that their multiple registrations alone are not dispositive of the bad-faith issue, their well-established pattern of registering multiple domain names containing <u>famous trademarks</u>, such as rollingstones.com, evinrude.com, and givenchy.com, <u>has</u> been made highly relevant to the determination of bad faith by the list of factors in ACPA.  <u>See</u> 15 U.S.C. § 1125(d)(1)(B)(i)(VIII) (noting as relevant factor "the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names").  Those facts are not clearly trumped by facts favoring defendants' side of the story, such as their use of northernlights.com as an e-mail domain name for several years prior to the dispute with the plaintiff and Burgar's initial resistance to the plaintiff's efforts to acquire defendants' domain-name registration.  The district court's finding that defendants were not entitled to the "escape clause"  also is not clearly erroneous; as the court found, defendants' oft-changing explanations for the purpose of the northernlights.com website

---

[11]The district court found that defendants' posting of a website at northernlights.com, rather than their initial domain-name registration, was the act that constituted bad-faith intent to profit in this case.  <u>See</u> 97 F. Supp. 2d at 119 n.27.

-23-

evince a lack of subjective belief in the domain name's fair use.

Based on defendants' apparent _modus_ _operandi_ of registering domain names containing the famous trademarks of others in the hope that the famous trademark holder will be willing to pay to reclaim its intellectual-property rights, the district court reasonably concluded that defendants acted according to script in this case.[12] Accordingly, we determine that the district court did not err in finding that defendants will likely be found to have acted in bad faith in operating their northernlights.com website.

## B. Retroactive Application of ACPA

Defendants also ask that we review the district court's legal determination that the retroactive application of ACPA to the facts of this case is permissible.[13] After reviewing the

---

[12]Defendants claim that since they expected no revenue stream from the content on the northernlights.com website, they could not have acted with a bad-faith intent to profit. Based on their past practices, however, it is reasonable to conclude that defendants harbored a broader, more long-term notion of "profit." Instead, defendants likely hoped to cash in on the confusion surrounding the sponsorship of the websites by finding famous trademark holders willing to pay defendants to end the diversion of Internet traffic from their website to defendants' sites.

[13]As we recently noted in _Hasbro, Inc._ v. _Clue Computing, Inc._, 232 F.3d 1 (1st Cir. 2000) (per curiam), courts are split on the issue of whether recent Lanham Act provisions should be applied retroactively. _Compare, e.g._, _Sporty's Farm, L.L.C._ v.

district court opinion and the parties' briefs, however, we find it unnecessary to reach this issue, as even if we were to decide the matter in defendants' favor, it would not provide an adequate basis for dissolving the injunction.  This is so because the district court expressly stated that its decision to impose a preliminary injunction rested principally upon its finding that Internet users would likely be confused by the concomitant existence of the northernlight.com and northernlights.com marks.  See 97 F. Supp. 2d at 121 ("Before turning to the balancing factors, I must emphasize the importance of the likelihood of confusion findings to the preliminary injunction calculus.").  Because an ACPA violation does not require a showing of likely confusion,[14] the district court's decision to enter a preliminary injunction must have been based on its resolution of the non-ACPA claims, such as plaintiff's trademark-infringement claim.  In their appeal,

---

Sportsman's Market, Inc., 202 F.3d 489, 496-97 (2d Cir.) (concluding that ACPA should apply retroactively), cert. denied, 120 S. Ct. 2719 (2000) with Thomas & Betts Corp. v. Panduit Corp., 108 F. Supp. 2d 976 (N.D. Ill. 2000) (holding that new trade-dress provisions of Lanham Act should not be applied retroactively).

[14]As the district court noted, the "likelihood of confusion" test of trademark infringement is "more comprehensive" than the "identical or confusingly similar" requirement of ACPA, as it requires considering factors beyond the facial similarity of the two marks.  97 F. Supp. 2d at 117.

-25-

defendants' only argument on the merits that does <u>not</u> impugn the district court's ACPA findings concerns the determination that Northern Lights acted in bad faith. And as we have determined in Part III.A, <u>supra</u>, that finding was not clearly erroneous. Thus, no matter how we might resolve the ACPA-retroactivity issue – and we expressly eschew doing so at this time – our decision would fail to affect the validity of the injunction.[15]

In sum, we conclude that defendants have identified no basis for overturning the preliminary injunction already in place. We therefore affirm its issuance by the district court.

---

[15]Defendants do claim that there were other "grossly unfair factual errors by the trial court" which constituted "an egregious result-driven pattern of prejudice" against them. But they have failed to specify those errors in their appellate briefs.

## IV. First Amendment Overbreadth of the Injunction

Defendants argue that the scope of the preliminary injunction violates the First Amendment. We need not, however, consider that issue here, for although it may have been raised below, defendants did no more than obliquely refer to the issue when the district court held the critical hearing, and subsequently took part in the framing of the preliminary injunction. Because we do not find waiver, the issue can be argued in the trial on the merits.

### Conclusion

Because the district court obtained personal jurisdiction over defendants when Burgar was served with process while in the forum state, we affirm, albeit on different grounds, the court's personal-jurisdiction finding. We find no basis for disturbing the court's determination of likelihood of success on the merits of plaintiff's suit, and therefore affirm those portions of the district court's opinion. Finally, while not precluding further consideration of the First Amendment issue at trial, we decline to resolve defendants' free-speech challenge to the scope of the injunction at this time.

**<u>Affirmed.</u>** Costs to appellee.