The BEACON MUTUAL INSURANCE COMPANY, Plaintiff,

v.

ONEBEACON INSURANCE GROUP, Defendant.

C.A. No. 01–354S.

United States District Court, D. Rhode Island.

Nov. 14, 2003.

See also 253 F.Supp.2d 221.

242

Steven E. Snow, Michael A. Gamboli, Partridge, Snow & Hahn LLP, Providence, RI, for Plaintiff.

William M. Dolan, III, Brown Rudnick Berlack Israels LLP, Providence, RI, Martha J. Collins, Steven A. Kaufman, Ropes & Gray, Boston, MA, for Defendant.

### DECISION AND ORDER

SMITH, District Judge.

In this trademark infringement action, the Court considers whether the use of the name "OneBeacon" and a lighthouse logo violates the Lanham Act and Rhode Island's common and statutory trademark and service mark laws. Defendant OneBeacon Insurance Group moves for summary judgment on all claims brought by the Plaintiff The Beacon Mutual Insurance Company. For the following reasons, the motion is granted.

### 1. *Background*

The Beacon Mutual Insurance Company ("Plaintiff" or "Beacon") is the largest writer of workers' compensation insurance in the state of Rhode Island, and has used the name "The Beacon Mutual Insurance Company" and a lighthouse logo ("Plaintiff's Marks") since 1992. All employers with at least one employee in Rhode Island must purchase workers' compensation insurance. *See* R.I. Gen. Laws § 28–29–6. Since its inception as the Workers' Compensation Insurance Fund in 1990, a state-chartered provider of workers' compensation insurance, *see* n. 9 *infra,* Plaintiff has increased its promotional spending to retain and attract customers: from $5,000 in 1992 to well over $1,000,000 in 2000 and 2001. Notwithstanding these efforts, however, Plaintiff's share of the workers' compensation market in Rhode Island has fluctuated over the past decade: in 1994, Plaintiff had almost 85% of the market, but by 2001, Plaintiff's market share had fallen to 66%.[1]

Defendant OneBeacon Insurance Group ("Defendant" or "OneBeacon"), formerly known as CGU Insurance, changed its

---

1. Plaintiff's market share fell to its lowest point in 1997 (51.43%) and has gradually increased in each subsequent year. *See* n. 9 *infra.*

name in June of 2001, and began using a lighthouse logo as well. Plaintiff alleges that Defendant's use of the name "One-Beacon" and a lighthouse logo similar to its own has damaged it, and violates the Lanham Act (15 U.S.C. § 1125(a)) (Count I); Rhode Island's unfair competition law (Count II); Rhode Island's service mark infringement common law (Count III); and Rhode Island's anti-dilution of common law trademark statute (Count IV).

OneBeacon moves for summary judgment on three principal grounds: (1) that Plaintiff's Marks are not legally protected because Plaintiff has not shown that they are sufficiently "distinctive"; (2) that there is no likelihood of confusion between the parties' marks (this contention comprises the majority of the motion, and relates to Counts I, II, and III); and (3) that Plaintiff's Marks have not been diluted (this argument relates to Count IV alone).

### 2. *Summary Judgment Standard*

Federal Rule of Civil Procedure 56(c) states that a party shall be entitled to summary judgment

> if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c). When ruling on a motion for summary judgment, this Court must review the evidence in the light most favorable to the nonmoving party and must draw all reasonable inferences in the nonmoving party's favor. *Rochester Ford Sales, Inc. v. Ford Motor Co.*, 287 F.3d 32,

38 (1st Cir.2002); *Mesnick v. General Electric Co.*, 950 F.2d 816, 820 (1st Cir. 1991); *Griggs–Ryan v. Smith*, 904 F.2d 112, 115 (1st Cir.1990).

To oppose the motion successfully, the nonmoving party "may not rest upon mere allegation or denials of his pleading." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Moreover, the evidence presented by the nonmoving party " 'cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve at an ensuing trial.' " *Mesnick*, 950 F.2d at 822 (citing *Mack v. Great Atl. & Pac. Tea Co.*, 871 F.2d 179, 181 (1st Cir.1989)). In the context of a trademark infringement case,

> Rule 56 places a special gloss upon the usual analytic approach. On summary judgment the reviewing court must decide whether the evidence as a whole, taken most hospitably to the markholder, generates a triable issue as to likelihood of confusion.

*Int'l Assoc. of Machinists and Aerospace Workers, AFL–CIO v. Winship Green Nursing Center*, 103 F.3d 196, 201 (1st Cir.1996).

### 3. *Analysis*

#### A. *General Principles of Federal Trademark Protection*

The Lanham Act was intended to make "actionable the deceptive and misleading use of marks" and "to protect persons engaged in ... commerce against unfair competition." 15 U.S.C. § 1127.

It is undisputed that Plaintiff's Marks are not registered trademarks,[2] trade

---

**2.** A trademark is defined in 15 U.S.C. § 1127 as including "any word, name, symbol, or device or any combination thereof" used by any person "to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown." In order to be regis-

names, or service marks. The Lanham Act, however, also protects unregistered trademarks, as it prohibits any person from using

> in connection with any goods or services . . . any word, term, name, symbol, or device, or any combination thereof . . . which . . . is likely to cause confusion, or to cause mistake, or to deceive . . . as to the origin, sponsorship, or approval of his or her goods . . . by another person[.]

15 U.S.C. § 1125(a)(1)(A).

■ Thus, in order to make out a claim under § 1125(a), a plaintiff must establish that its mark is (1) either inherently distinctive or has acquired secondary meaning; (2) not merely functional;[3] and (3) likely to be confused with defendant's mark. *Three Blind Mice Designs Co., Inc. v. Cyrk, Inc.*, 892 F.Supp. 303, 310 (D.Mass.1995).

### B. *The Lanham Act Claim*

#### 1. *Distinctiveness*

The First Circuit has instructed that "[a] court's inquiry into whether a term merits trademark protection starts with the classification of that term along the spectrum of 'distinctiveness.'" *Boston Beer Co. L.P. v. Slesar Bros. Brewing Co.*, 9 F.3d 175, 180 (1st Cir.1993); *see also The Yankee Candle Co., Inc. v. Bridgewater Candle Co., LLC*, 259 F.3d 25, 38 (1st Cir.2001) ("Distinctiveness may be either 'inherent,' that is, the 'intrinsic nature [of

the trademark] serves to identify a particular source,' or 'acquired,' i.e., the trade[mark] has acquired a 'secondary meaning' whereby the public views its 'primary significance . . . as identify[ing] the source of the product rather than the product itself.'") (citations omitted). "Whether a term is generic, descriptive, or inherently distinctive is a question of fact." *Boston Beer*, 9 F.3d at 180.

Defendant contends that Plaintiff has not met its burden to demonstrate a genuine issue of material fact as to whether Plaintiff's Marks are distinctive under either the "inherently distinctive" or the "secondary meaning" rubrics. This argument depends *a priori* on the exclusion of Plaintiff's expert testimony and evidence— the consumer survey and accompanying report of Dr. Jacob Jacoby. Because this Court has ruled that the factfinder may consider this evidence, *see Beacon Mut. Ins. Co. v. Onebeacon Ins. Group*, 253 F.Supp.2d 221 (D.R.I.2003), the basis for Defendant's argument on this point collapses. Consequently, there exists a genuine issue of material fact as to distinctiveness.

#### 2. *Likelihood of Confusion*

■ With functionality conceded by the Defendant for purposes of this motion, and distinctiveness in issue, Defendant's argument comes down to its assertion that Plaintiff has failed to demonstrate "likelihood of confusion." In this Circuit, the factors to be assessed in determining

---

tered, a mark must be capable of distinguishing the applicant's goods from those of others.

**3.** " 'The functionality doctrine prevents trademark law, which seeks to promote competition by protecting a firm's reputation, from instead inhibiting legitimate competition by allowing a producer to control a useful product feature.' Thus, the functionality doctrine marks the boundaries of trade dress protection." *I.P. Lund Trading ApS v. Kohler Co.*,

163 F.3d 27, 36 (1st Cir.1998) (internal citation omitted) (certain features of a water faucet are features that every water faucet must have in order to function as a water faucet, and therefore cannot be the subject of a trade dress infringement action). Defendant concedes, for summary judgment purposes, that Plaintiff can prove non-functionality of its Marks.

whether a likelihood of confusion exists between the plaintiff's and defendant's marks are: (1) the similarity of the marks; (2) the similarity of the goods or services; (3) the relationship between the parties' channels of trade; (4) the relationship between the parties' advertising; (5) the classes of prospective purchasers; (6) evidence of actual confusion; (7) the defendant's intent in adopting the mark; and (8) the strength of the plaintiff's mark. *Astra Pharmaceutical Prods., Inc. v. Beckman Instruments, Inc.*, 718 F.2d 1201, 1205 (1st Cir.1983). While no one factor is necessarily determinative, each must be considered. *Id.*

In order to assess these eight factors in a meaningful way, it is necessary first to determine the relevant market in which they apply. OneBeacon markets its products exclusively through a group of selected insurance agents. It contends that the relevant market is limited to those agents who sell OneBeacon products. OneBeacon argues that because it does not sell a workers' compensation product in Rhode Island, any confusion among business owners or others charged with purchasing workers' compensation insurance for their companies is not relevant; if it exists at all, it will always be corrected by the agents when any such confused purchaser attempts to purchase workers' compensation insurance from a OneBeacon agent. Defendant supports this position with an expert who, not surprisingly, reports that none of the OneBeacon agents in Rhode Island are confused. *See* pp. 247–248 *infra.*

Plaintiff argues that Defendant's definition of the relevant market is far too narrow. Plaintiff points to considerable authority (some of it from courts in this Circuit) indicating that persons who may influence future purchases, users of the goods and services, lenders or investors, suppliers, vendors, retailers and others in the distribution chain, as well as constituents or supporters of noncommercial organizations all make up the relevant market for its product. Pl. Mem. at 5–7. Michael Lynch, Plaintiff's Vice President of Legal Services, testified extensively by affidavit regarding the evidence of actual confusion within the workers' compensation system about whether Plaintiff and Defendant are the same or affiliated companies. This confusion has allegedly affected Plaintiff's clients' insurance agents, healthcare providers, third party insurance agents, various members of the legal profession (attorneys and law office personnel) as well as Rhode Island Workers' Compensation Court personnel, and several Rhode Island government agencies. Lynch Aff., ¶¶ 11–18. Plaintiff's so-called "Confusion Matrix" documents 249 separate instances of alleged actual confusion in the community. Lynch Aff., Ex. A. There is little doubt that the confusion Plaintiff complains of is real. The question is whether this confusion is actually relevant to the market in which Plaintiff competes. Stated another way, the question for this Court is whether the confusion that is proved by the Confusion Matrix raises a disputed issue of material fact with respect to the likelihood of confusion in the market in which Plaintiff competes for business.

To make this connection, Plaintiff asserts that likelihood of confusion can occur not only at the point of sale, but also where a potential purchaser may be misled into an interest in the infringer's product, even if that confusion is cured at some later point (*e.g.*, at the point of sale). This type of confusion is denominated "initial interest" confusion. It is unclear, however, whether the First Circuit recognizes it as valid. *See Hasbro, Inc. v. Clue Computing, Inc.*, 232 F.3d 1, 2 (1st Cir.2000) (applauding the lower court for its "refusal

to enter the 'initial interest confusion' thicket"); *Astra,* 718 F.2d at 1207 (no evidence of "temporary" confusion); *Northern Light Tech. v. Northern Lights Club,* 97 F.Supp.2d 96, 113 (D.Mass.2000) (initial interest confusion is "not cognizable" under the First Circuit's trademark law), *aff'd on other grounds* (without discussion of initial interest confusion), 236 F.3d 57 (1st Cir.2001); *EMC Corp. v. Hewlett–Packard Co.,* 59 F.Supp.2d 147, 150 (D.Mass.1999) (court rejected argument that the First Circuit rejects the initial interest confusion theory, observing that the First Circuit had not given the subject enough attention as to be understood to have rejected the theory).[4]

Plaintiff also relies on the doctrine of "post-sale" confusion to give relevance to its Matrix. "Post-sale confusion refers not to the resale of the original product ... but to the risk that non-purchasers, who themselves may be future consumers, will be deceived." *I.P. Lund,* 163 F.3d at 44 (citing 3 McCarthy § 23:7 ("noting that '[t]he damage to the senior user ... is that consumers could acquire the prestige value of the senior user's product by buying the copier's cheap imitation,' and that in such a case, '[e]ven though the knowledgeable buyer knew that it was getting an imitation, viewers would be confused'))." There is no dispute that post-sale confusion is a valid theory in this Circuit. *See I.P. Lund,* 163 F.3d at 44; *Butcher Co., Inc. v. Bouthot,* 124 F.Supp.2d 750, 757 (D.Me. 2001). As discussed below, however, Plaintiff has not established that the entities and persons identified in its Matrix fall into the post-sale confusion category, for the simple reason that the confused entities are not consumers of the product, nor has Plaintiff shown any commercial relevance as to these entities.

The basic test of relevance against which alleged confusion must be measured in this Circuit was first enunciated in *Astra:* "If likelihood of confusion exists, it must be based on the confusion of some relevant person; *i.e.,* a customer or purchaser." 718 F.2d at 1206. Judge Hornby of the District of Maine has elaborated on the *Astra* standard in an illuminating way:

> The eight-factor confusion test is not applied to assess confusion in the abstract; it is focused on the likelihood that commercially relevant persons or

---

**4.** Other circuits, including the Second, Third, Fifth, Seventh, and Ninth, have accepted initial interest confusion as a valid theory of trademark infringement. *See Mobil Oil Corp. v. Pegasus Petroleum Corp.,* 818 F.2d 254, 259 (2nd Cir.1987) (finding actionable confusion "not in the fact that a third party would do business with Pegasus Petroleum believing it related to Mobil [and its winged horse trademark], but rather in the likelihood that Pegasus Petroleum would gain crucial credibility during the initial phases of a deal. For example, an oil trader might listen to a cold phone call from Pegasus Petroleum—an admittedly oft used procedure in the oil trading business—when otherwise he might not, because of the possibility that Pegasus Petroleum is related to Mobil."); *Checkpoint Systems, Inc. v. Check Point Software Techs., Inc.,* 269 F.3d 270, 294 (3rd Cir.2001) ("We join these circuits in holding that initial interest confusion is probative of a Lanham Act violation."); *Elvis Presley Enters., Inc. v. Capece,* 141 F.3d 188, 204 (5th Cir.1998) (" 'Infringement can be based upon confusion that creates initial customer interest, even though no actual sale is finally completed as a result of the confusion.' " (citing 3 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 23:6 (4th ed.1997))); *Forum Corp. of North Am. v. Forum, Ltd.,* 903 F.2d 434, 442 n. 2 (7th Cir.1990) ("[T]he fact that confusion as to the source of a product or service is eventually dispelled does not eliminate the trademark infringement which has already occurred."); *Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.,* 109 F.3d 1394, 1405 (9th Cir.1997) ("[T]he use of ... the confusingly similar title to capture initial consumer attention, even though no actual sale is finally completed as a result of the confusion, may be still an infringement.").

entities will be confused. *See Astra Pharmaceutical,* 718 F.2d at 1207. Actual and potential customers of the trademark owner are the most obvious "relevant persons," but other persons might be relevant in a given case. "To be actionable ..., the confusion must threaten the commercial interests of the owner of the mark, but it is not limited to the confusion of persons doing business directly with the [trademark owner or infringer]." Restatement (Third) of Unfair Competition § 20 at 210 (1995). *CMM Cable Rep., Inc. v. Ocean Coast Properties, Inc.,* 888 F.Supp. 192, 200 (D.Me.1995), *aff'd,* 97 F.3d 1504 (1st Cir. 1996); *cf. Landscape Forms, Inc. v. Columbia Cascade Co.,* 113 F.3d 373, 382–83 (2nd Cir.1997) ("The likelihood of confusion test concerns not only potential purchasers but also the general public. But, such third parties are only relevant if their views are somehow related to the goodwill of the aggrieved manufacturer.") (internal citations omitted).

The definition of the relevant market advocated by Defendant is far too restrictive. While it may be the case that all confusion of actual purchasers is corrected at the point of sale, this writer believes that *Astra* and *CMM* contemplate that a broader spectrum of commercial interests must be considered when evaluating the likelihood of confusion. For example, as will be discussed in more detail below, confusion that causes a current Beacon customer to switch to another carrier (other than OneBeacon) may impact Beacon's commercial interests and not be correctable by a OneBeacon agent. By the same token, the spectrum of relevant commercial interests is not nearly so broad as Plaintiff would have it. It is not "confusion in the abstract" that the Lanham Act was meant to prevent. So while the Plaintiff's Confusion Matrix is impressive, in order to be useful in defeating the Motion

for Summary Judgment it must somehow be connected to the commercial interests of the Plaintiff.

■ Thus, the relevant market in this case falls somewhere between the very narrow definition proffered by the Defendant, and the sweeping definition supported by the Plaintiff's Confusion Matrix. The relevant market is, as explained in *CMM,* driven by the "commercial relevance" of individuals or entities likely to be confused by the offending conduct. If the examples proffered by the Plaintiff are shown to have a connection to the Plaintiff's commercial interests, then a triable issue exists with respect to the likelihood of confusion in the relevant market caused by the allegedly infringing conduct. To answer this question, the Court turns to the eight factor analysis.

### a. *Factors Three, Four, and Five*

■ The Court first examines factors three, four, and five, which are frequently assessed together. *See Pignons S.A. de Mecanique de Precision v. Polaroid Corp.,* 657 F.2d 482, 488 (1st Cir.1981). These three factors—the relationship between the parties' channels of trade, the relationship between the parties' advertising, and the classes of prospective purchasers of the parties' products—are central to this case.

Defendant contends that factor three, the parties' channels of trade, weighs in its favor for the reasons discussed above. OneBeacon's workers' compensation policies are available for sale solely through OneBeacon's insurance agents. Thus, the argument goes, if OneBeacon's agents are not confused, it is virtually impossible for prospective buyers to be confused, as they will be guided in their purchasing decisions by the agents. Defendant relies on the findings of its expert, Jessica Pollner, who

conducted a survey of 48 of the 140 One-Beacon insurance agents doing business in Rhode Island. Every one of those 48 One-Beacon agents stated that none of their clients had ever requested a particular insurer, only the terms of the policy.

But as already noted, this argument does not account for the larger group of potentially commercially relevant persons described above—those that could impact, by their confusion, the decision whether to purchase Plaintiff's insurance policies. In its Confusion Matrix, Plaintiff lists nine different categories of confusion in the public relating to the identity of or relationship between Plaintiff and Defendant. Many of these consist either of isolated and sporadic examples of alleged confusion (*i.e.,* two or three listings) or, even if more numerous, cannot conceivably be deemed "commercially relevant" in any way. However, the confusion in three of these categories is worthy of more detailed scrutiny:

### i. *Insurance Agencies*

This category, numbering 18 examples, includes individual insurance companies that have sent correspondence to one of the two parties meaning to send it to or communicate with the other. One cannot be sure from the information provided in the Confusion Matrix whether the person making the mistake is also involved in the choice of which insurance policy to pur-

chase. Thus, although it is possible to conceive of a causal chain in which this confusion might ultimately impact the purchasing decision,[5] Plaintiff has not presented any actual evidence that this has ever occurred. Plaintiff offers no testimony that purchasers of its policies have been confused or that they have taken into account others' confusion; there is no indication that this type of confusion has ever played any role in the purchasing calculus, and the Court will not speculate, in the absence of evidence, about the possible nocent effect of this confusion on Plaintiff's market interests.

### ii. *Insureds*

Of the 23 examples in this grouping, the most compelling are those that relate to insurance payments that were sent to Defendant but that should have been sent to Plaintiff. Although it is true that these errors were eventually corrected, when added together, the amount of money that Plaintiff should have been receiving in a timely manner, but which it was not by dint of the confusion of its insureds, is substantial. Each misdirected check is in the hundreds or thousands of dollars.

Once again, however, the Court is left to speculate about the effect of these late payments. It is possible that receiving checks late could affect Plaintiff's books, which might have other undesirable conse-

---

**5.** For example, if these types of errors were frequent enough, it is possible that, other things (such as the respective terms of the competing policies under consideration) being equal, the person making the purchasing decisions would select another workers' compensation insurance provider over Plaintiff because of the nuisance and the attendant costs of conducting business with Plaintiff. One could hypothesize a situation in which confusion about the relationship between Plaintiff and Defendant, if sufficiently severe and pervasive, might effectively grind Plaintiff's daily business operations to a halt. If such volume were to exist, this group of con- fused individuals might influence purchasing decisions simply by the frequency of their errors. *Cf. United States Surgical Corp. v. Orris, Inc.,* 5 F.Supp.2d 1201, 1211 (D.Kan. 1998) (surgeons' confusion is relevant to the extent it influences a hospital's purchasing decisions; if a surgeon is unaware of the genesis of the instrument that he is using, he is not confused, and therefore he cannot affect the purchasing decision; on the other hand, if the surgeon uses an instrument mistakenly believing it to have a certain genesis, and that mistaken belief influences a purchasing decision, the surgeon's confusion is commercially relevant).

quences: *e.g.,* each time an insured is late in its payments, Plaintiff may have procedures that it follows to pursue the delinquent insured. Following such procedures probably has costs associated with it, and, even if undeserved, possibly may create agitation and resentment in the insured. It is possible to speculate that Plaintiff might even terminate a policy due to delinquency, which, in turn, could lead to legal action for unlawful termination of that policy.

But all of this is rank speculation. Plaintiff has put on no evidence that it has lost any business as a result of confusion among its insured: it has offered no financial statements or customer account statements or any other evidence that would indicate a drop in business since the time that Defendant began to use the name OneBeacon or its lighthouse symbol;[6] nor has Plaintiff proffered any evidence from which this Court reasonably could infer that the confusion has affected the decision of any insured to switch providers. If such evidence existed, Plaintiff could and should have produced it. From that type of evidence, the Court might have drawn a reasonable inference that the confusion of the insureds had caused some to stop purchasing Plaintiff's product. Such evidence would make the confusion among the insured commercially relevant.

None of this was done, and so this Court must conclude that Plaintiff has failed to meet its burden of "adducing 'significantly probative' evidence" that the confusion identified had any effect whatsoever on the ultimate purchasing decision. *Winship Green,* 103 F.3d at 201.

### iii. *Attorneys/Courts*

This category consists primarily of correspondence (enclosing medical information and/or administrative material) sent from the Rhode Island Workers' Compensation Court or by attorneys or staff at private law firms, in error, to Plaintiff when they were meant for Defendant, or vice versa. There are 72 examples of such mailing errors. It is undeniable that this category does not congrue at all with the notion that the confusion of customers or purchasers is the most relevant consideration. *See Astra,* 718 F.2d at 1207. Attorneys and court personnel clearly are not direct customers or purchasers of insurance, whether of the workers' compensation variety or otherwise. However, and as in the previous examples, such confusion might still be conceivably relevant to Plaintiff's market interests if Plaintiff were able to show, for example, that it caused significant delays in the processing of claims and needless costs, which, in turn, caused a purchaser to change providers. There is a *potential* for economic loss by the Plaintiff as a result of this confusion. But that potential is entirely conjectural because Plaintiff has not supplied any evidence from which the Court could draw the necessary inference.

"Genuine issues of material fact are not the stuff of an opposing party's [or a court's] dreams. On issues where the nonmovant bears the ultimate burden of proof, he must present definite, competent evidence to rebut the motion[,]" that is neither "conjectural [n]or problematic." *Mesnick,* 950 F.2d at 822 (citations omitted).[7]

---

**6.** In fact, the evidence before the Court suggests just the opposite: Plaintiff has increased its workers' compensation market share since 2001.

**7.** The Court observes that Mr. Lynch has attempted, in a single paragraph of conclusory statements unsupported by anything else in the record, to make the necessary link. *See* Lynch Aff., ¶ 21. These statements, without anything more (as they are), are not "definite, competent evidence" sufficient to rebut the Defendant's motion. *Mesnick,* 950 F.2d at 822.

Because the nexus between the proved confusion and its alleged commercial relevance is completely conjectural and problematic, this factor must fall in favor of the Defendant.

Factor four regards the parties' use of advertising. Defendant has presented evidence that OneBeacon does not advertise or promote its workers' compensation insurance in Rhode Island, and that this absence of advertising reduces possible confusion. Plaintiff counters that this "absence of side-by-side advertising" by the parties increases the likelihood of confusion because it does not permit a prospective customer to understand that two different companies exist. While it has been said that companies advertising side-by-side create less confusion in the relevant market, *see HQ Network Systems v. Executive Headquarters,* 755 F.Supp. 1110, 1118 (D.Mass.1991), an equally persuasive argument may be made that an utter lack of advertising in Rhode Island by Defendant indicates that there is no confusion that "The Beacon," in Rhode Island, refers to the Plaintiff. This factor does not weigh strongly in either party's favor.

Factor five, the classes of prospective purchasers, favors Defendant. As already stated, "[c]ourts have found less likelihood of confusion where goods are expensive and purchased after careful consideration." *Pignons,* 657 F.2d at 489. The purchase of workers' compensation insurance is assuredly an expensive proposition, and those whose business it is to purchase it are sophisticated buyers.

b. *The Remaining Factors*

The first factor is whether the marks of the parties are "similar," which the parties agree is evaluated "on the basis of the total effect of the designation, rather than a comparison of individual features." *As-*

*tra,* 718 F.2d at 1205. Defendant argues that the "text, fonts, and orientation of the designations" are distinct. But the word "Beacon" and the lighthouse symbol appear in both marks. *Cf. Winship Green,* 103 F.3d at 204 ("What is more, we have recognized that in certain circumstances otherwise similar marks are not likely to be confused if they are used in conjunction with clearly displayed names, logos or other source-identifying designations of the manufacturer." (citing *Aktiebolaget Electrolux v. Armatron Int'l, Inc.,* 999 F.2d 1, 4 (1st Cir.1993))). Unlike the facts in *Winship Green* and *Armatron,* the logos here, lighthouses, *are* used by both parties. This factor favors Plaintiff.

The second factor, similarity of goods or services, does not weigh in either party's favor. Although the parties both sell workers' compensation insurance policies, the majority of Defendant's business comes from selling insurance other than workers' compensation. The business of both parties nevertheless is to sell insurance (including workers' compensation insurance), and as such the parties' goods and services indisputably are similar. *Cf. Hasbro,* 232 F.3d at 2 (computer consulting firm did not infringe on board game maker's mark "Clue" because goods and services offered by the parties were wholly distinct); *Astra,* 718 F.2d at 1205 (name of drug used as anaesthetic was not infringed upon by blood analyzer with the same name because products were so different). At oral argument, counsel for the Defendant made much of the differences between the parties' policies (*e.g.,* different terms, pricing, and customers). These distinctions are relevant, but not necessarily sufficient to rebut the overall similarity of the goods and services in question. In any case, this factor may favor the Plaintiff slightly, but is not a significant factor overall.[8]

---

8. The degree of "similarity" between two par-  ties' goods or services that is sufficient to

As for factor six, evidence of actual confusion, although it is strong evidence of confusion, *see Railroad Salvage of Conn., Inc. v. Railroad Salvage, Inc.,* 561 F.Supp. 1014, 1021 (D.R.I.1983), it is not a requirement. The analysis of this factor draws heavily on that which applied to channels of trade. As discussed above, given the failure of the Plaintiff to present competent evidence connecting the actual confusion with the ultimate purchasing decision or otherwise demonstrate commercial relevance, this factor weighs in Defendant's favor.

Element seven is the defendant's intent in adopting the mark. The First Circuit has clearly devalued the importance of this factor. *See I.P. Lund,* 163 F.3d at 44 ("little weight should be given to the determination that [defendant] did not intend to copy [the mark]"); *Chrysler Corp. v. Silva,* 118 F.3d 56, 59 n. 3 (1st Cir.1997) ("Strictly, intent, or lack thereof, does not affect the eyes of the viewer. Proof of bad intent may, psychologically, hurt as an ad-

mission[,]" but "[p]roof of good intent does not change appearance."). Nevertheless, Defendant presents evidence that it adopted the name OneBeacon in good faith and without intending to imitate Plaintiff, and so this factor, to the extent it is meaningful at all, weighs in Defendant's favor.

The last factor is the strength of the mark. Defendant argues that other insurers and Rhode Island businesses use the word "beacon" and a lighthouse symbol, and that Plaintiff's Marks are therefore weak. Plaintiff argues that it has worked for a decade to make itself the premiere seller in Rhode Island of workers' compensation insurance, and that these marketing efforts have resulted in its controlling 65% of the Rhode Island workers' compensation market.[9] In fact, Defendant has not shown that Plaintiff's Marks are "hemmed in" by other companies using similar marks. Moreover, Dr. Jacoby's survey indicates that many Rhode Island respondents associate Plaintiff's Marks with

carry this factor, assuming that the goods or services are not identical, is less than crystalline. *Compare Pignons,* 657 F.2d at 487–88 (though the products were both "single lens reflex cameras," the court found them dissimilar because of their unique features and prices), *with Hasbro,* 232 F.3d at 2 (totally different products); *HQ Network Systems v. Executive Headquarters,* 755 F.Supp. 1110, 1118 (D.Mass.1991) (two companies which both rented executive office space and ancillary services were held to offer similar goods and services, even though one provided "superior arrangements, with more services, higher internal standards, but higher costs to clients").

9. The Court finds this assertion somewhat dubious. Plaintiff's market share is more a function of its unique genesis as anything else. The historical reality is well known in our little state: As a result of rising costs and other institutional problems in the late 1980s, insurance companies providing workers' compensation insurance coverage fled Rhode

Island in droves, leaving the business community with no source of coverage. In response, the Governor formed a commission to develop proposals to reform the workers' compensation system. Among the solutions was the creation of a state-chartered provider of workers' compensation insurance. The Beacon Mutual Insurance Company was, thus, created in 1990 by an act of the Rhode Island General Assembly as the "Workers' Compensation Insurance Fund." *See* R.I. Gen. Laws § 27–7.2–1 *et seq.* (2002) (repealed 2003) (current version at 2003 R.I. Pub. Laws 03–410 (03–S 857)). Plaintiff therefore began its existence with a virtual captive market of Rhode Island business. Its market share over the last ten years has not increased to 65%, but has instead decreased to that point because competitors have returned to the market. This is not to say that Plaintiff has not worked hard to create and strengthen its Marks; it clearly has. However, the traditional measures of the success of these efforts do not necessarily apply in this case, given this historical context.

Plaintiff, and this is therefore a factor that weighs in Plaintiff's favor.

Having considered and weighed the eight pertinent factors, the Court finds that Defendant clearly prevails on the critical confusion factors in this case: channels of trade, classes of prospective purchasers, and evidence of actual confusion. Although Plaintiff has presented some evidence that its Marks are strong, and has established a certain similarity between its Marks and those used by Defendant, these showings are insufficient to mitigate its fatal failure to demonstrate that the confusion it identifies is connected in any way to its commercial interests. Consequently, the Court concludes that on balance, analysis of the eight factors overwhelmingly favors the Defendant, and that Plaintiff's case does not pass the "likelihood of confusion" test. Summary judgment as to Counts I, II, and III [10] is therefore appropriate.

### C. State Dilution Claim

R.I. Gen. Laws § 6–2–12 states:

**Injury to business reputation—Dilution.**—Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark registered under this chapter, or a mark valid at common law, or a trade name valid at common law, shall be a ground for injunctive relief notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services.

 There are precious few cases plumbing the reaches of this statute, but the analogous Massachusetts statute has been interpreted to require a plaintiff to show: (1) injury to the value of the mark caused by actual or potential confusion; (2) injury resulting from use of the mark in a way that detracts from, draws on, or otherwise appropriates the goodwill and reputation associated with the mark; or (3) diminution in the uniqueness and individuality of the mark. *Astra,* 718 F.2d at 1209; *Black Dog Tavern Co., Inc. v. Hall,* 823 F.Supp. 48, 59 (D.Mass.1993). Because the Court has held that Plaintiff cannot survive summary judgment on the likelihood of confusion prong of its Lanham Act claim, so, too, does its dilution claim fail.[11]

### 4. Conclusion

For the foregoing reasons, Defendant's Motion for Summary Judgment is GRANTED.

IT IS SO ORDERED.

---

**10.** Defendant makes no separate arguments in favor of summary judgment with respect to Counts II and III.

**11.** In a footnote, Defendant apprises the Court that one court in this Circuit has held that the Lanham Act preempts a claim of dilution under Massachusetts law when the parties' products are similar and competitive. Def. Mem. at 13 n. 6 (citing *Three Blind Mice Designs Co., Inc. v. Cyrk, Inc.,* 892 F.Supp. 303, 309 (D.Mass.1995)). Other courts have disagreed with this conclusion. *See, e.g., Nikon Inc. v. Ikon Corp.,* 987 F.2d 91, 96 (2nd Cir.1993) (Lanham Act does not preempt New York state anti-dilution statute); *Ringling Bros.-Barnum & Bailey Combined Shows, Inc. v. Celozzi-Ettelson Chevrolet, Inc.,* 855 F.2d 480, 483 (7th Cir.1988)("[N]o direct conflict exists between the Lanham Act and the [Illinois] Anti–Dilution Act....."). Other than Defendant's footnote, and a responsive footnote in Plaintiff's memorandum, this issue has not been briefed. The Court will not address arguments that have not been squarely and properly advanced.